IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
EASTERN DIVISION



SOUTHERN DISTRICT OF MISSISSIPPI
**FILED**

SEP 2 4 2019

ARTHUR JOHNSTON
BY_____ DEPUTY

UNITED STATES OF AMERICA

v.

WADE ASHLEY WALTERS

**SUPERSEDING INDICTMENT**
CRIMINAL NO. 2:19cr51-KS-MTP

18 U.S.C. § 1031
18 U.S.C. § 1349
18 U.S.C. § 1343
18 U.S.C. § 1341
21 U.S.C. § 846
21 U.S.C. § 841
18 U.S.C. § 371
42 U.S.C. § 1320a-7b
18 U.S.C. § 1956(h)
18 U.S.C. § 1956(a)(1)(B)(i)

**The Grand Jury Charges:**

At all times relevant to this Superseding Indictment:

## GENERAL ALLEGATIONS

### Defendant and Introduction

1.     **WADE ASHLEY WALTERS ("WALTERS")**, of Lamar County, Mississippi, co-owned and operated several companies and pharmacies located in the Southern District of Mississippi, and elsewhere, that procured prescriptions for and ultimately dispensed compounded medications to individuals throughout the United States.

2.     As detailed herein, approximately between August 2012 and January 2016, **WALTERS** conspired to and engaged in a scheme to defraud the United States and numerous health care benefit programs of more than $510 million.  To that end, **WALTERS** and his co-conspirators fraudulently formulated, prescribed, dispensed, shipped, and billed insurance companies for compounded medications produced and dispensed by several compounding pharmacies, including

pharmacies **WALTERS** owned and controlled.    **WALTERS'** scheme to dispense these compounded medications in the form of topical creams and vitamins, some of which contained controlled substances, to thousands of Americans circumvented federal regulations and approvals regarding use and efficacy, and further exploited the manner in which health insurance companies reimbursed the dispensation of compounded medications. To further facilitate the scheme to defraud the United States and other health care benefit programs, **WALTERS** conspired to and engaged in a scheme to solicit and receive kickbacks and bribes from pharmacies, and to offer and pay kickbacks and bribes to physicians, other medical providers, recruiters, and beneficiaries to prescribe, refer, and receive prescriptions for medically unnecessary compounded medications. Finally, during the same time frame, **WALTERS** also conspired to and engaged in a scheme to launder monetary instruments to conceal the proceeds he obtained for his participation in the scheme to defraud.

### Compounded Medications

3.    Section 505 of the Food, Drug, and Cosmetic Act ("Food and Drug Act") required drug manufacturers and producers to receive approval by the United States Food and Drug Administration ("FDA") before introducing new drugs into interstate commerce.

4.    Section 502 of the Food and Drug Act exempted compounded medications from receiving FDA approval if the compounded medication was compounded by a licensed pharmacist, or other licensed professional, for an identified individual, based on the unsolicited receipt of a valid prescription that was medically necessary for the identified individual.

5.    In other words, to be exempt from FDA approval, compounded medications were drugs that were combined, mixed, or altered by licensed pharmacists or other licensed practitioners, pursuant to valid prescriptions issued by licensed medical professionals, including physicians and

2

nurse practitioners ("practitioners"), to meet the specific needs of individual patients.

6.     Practitioners could prescribe compounded medications to patients upon considering patients' diagnoses, medical conditions, health factors, and reactions to other medications. Although ingredients in compounded medications were generally approved by the FDA, the compounded form of those medications were not. There were risks associated with prescribing drugs that did not meet federal quality standards, so compounded medications were meant to be prescribed when the needs of a patient could not be met by an FDA-approved medication.

### Controlled Substances Act

7.     The Controlled Substances Act ("CSA") governed the manufacture, distribution, and dispensing of controlled substances in the United States. The CSA and the Code of Federal Regulations ("CFR") contained definitions relevant to this Superseding Indictment, some of which are set forth below.

8.     Under the CSA, the United States Drug Enforcement Administration ("DEA") regulated certain pharmaceutical drugs that were classified as controlled substances because of their potential for abuse or dependence, their accepted medical use, and their accepted safety for use under medical supervision.

9.     Controlled substances were classified into five schedules, from Schedule I through Schedule V. Schedule I contained the most dangerous drugs with the highest potential for abuse or dependence, and had no accepted medical use in the United States; and Schedule V contained the least dangerous drugs with the lowest potential for abuse or dependence, and had accepted medical uses in the United States.

10.     The term "practitioner" was defined as a physician, nurse practitioner, or other individual licensed, registered, or otherwise permitted, by the United States or the jurisdiction in

3

which she or he practices, to distribute or dispense a controlled substance in the course of professional practice. 21 U.S.C. § 802(21).

11.    The term "in-person medical evaluation" was defined as "a medical evaluation that is conducted with the patient in the physical presence of the practitioner, without regard to whether portions of the evaluation are conducted by other health professionals." 21 U.S.C. § 829(e)(2)(B)(i).

12.    The term "covering practitioner" was defined as a practitioner who conducts a medical evaluation at the request of a practitioner who has already conducted an in-person medical evaluation or a telemedicine evaluation of the patient in the previous 24 months and is temporarily unavailable to conduct the evaluation. 21 U.S.C. § 829(e)(2)(C).

13.    The term "dispense" meant to deliver a controlled substance to an ultimate user by, or pursuant to the lawful order of, a practitioner, including the prescribing and administering of a controlled substance. 21 U.S.C. § 802(10).

14.    The term "distribute" meant to deliver (other than by administering or dispensing) a controlled substance. 21 U.S.C. § 802(11).

15.    The DEA issued registration numbers to qualifying practitioners, including physicians and nurse practitioners, which permitted them to prescribe and dispense Schedule II, III, IV, and V controlled substances consistent with the terms of that registration.

16.    Generally, Schedule III and Schedule IV drugs could only be dispensed by way of written or oral prescriptions issued by licensed and registered practitioners. 21 U.S.C. § 829(b).

17.    "A prescription for a controlled substance to be effective must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice." 21 C.F.R. § 1306.04(a). In other words, a valid prescription was defined as "a

4

prescription that is issued for a legitimate medical purpose in the usual course of professional practice by (i) a practitioner who has conducted at least 1 in-person medical evaluation of the patient; or (ii) a covering practitioner." 21 U.S.C. § 829(e)(2)(A).

18.     Ketamine was approved by the FDA as a general anesthetic, but, according to the DEA, ketamine was used, and often abused, for its hallucinogenic side effects. Ketamine was a Schedule III controlled substance under the CSA. Abuse of Schedule III drugs could lead to moderate or low physical dependence or high psychological dependence. 21 U.S.C. § 812(b)(3).

19.     Tramadol was a prescription opioid analgesic that was approved by the FDA for the treatment of moderate to moderately severe pain in adults. According to the FDA, tramadol could induce psychological and physical dependence of the morphine-type. Tramadol was a Schedule IV controlled substance under the laws of the state of Mississippi as of July 2011, and a Schedule IV controlled substance under the CSA as of August 18, 2014. 21 C.F.R. § 1308.14. Abuse of Schedule IV drugs could lead to limited physical dependence or psychological dependence. 21 U.S.C. § 812(b)(4).

### Health Care Benefit Programs and Claims Adjudication

20.     The United States Department of Defense, through the Defense Health Agency, administered the TRICARE program ("TRICARE"), which was a comprehensive health care insurance program that provided health care benefits to United States military personnel, retirees, and their families.

21.     In addition, various private insurance companies, including Blue Cross & Blue Shield of Mississippi, A Mutual Insurance Company ("Blue Cross"), provided health care benefits for individuals enrolled with their plans.

22.     TRICARE and these private insurance companies were each a "health care benefit

5

program" within the meaning of Title 18, United States Code, Section 24(b).

23.     Individuals who qualified for TRICARE benefits, and the benefits of other federal health care benefit programs, were referred to as "beneficiaries."

24.     Individuals who qualified for benefits from these private insurance companies, including Blue Cross, were referred to as "members."

25.     Medical service providers, including hospitals, clinics, physicians, nurse practitioners, and pharmacies ("providers"), meeting certain criteria, could enroll with health care benefit programs, including TRICARE and Blue Cross, and provide medical services to beneficiaries and members. Providers would then submit claims, either electronically or in hard copy, to health care benefit programs seeking reimbursement for the cost of items and services provided.

26.     TRICARE, Blue Cross, and the other health care benefit programs provided prescription drug coverage, including prescriptions for compounded medications, to eligible beneficiaries and members through their pharmacy programs or similar drug plans.

27.     TRICARE's pharmacy program and other health care benefit programs' drug plans were administered by Pharmacy Benefit Managers ("PBMs"), whose responsibilities included adjudicating and processing payment for prescription drug claims submitted by eligible pharmacies. PBMs also audited participating pharmacies to ensure compliance with their rules and regulations.

28.     Specifically, TRICARE, through the United States Department of Defense, contracted with Express Scripts to be its PBM, the value of which contract, between August 2012 and January 2016, far exceeded $1 billion.

29.     CVS Caremark was another PBM that provided pharmacy management services to various health care benefit programs, including Blue Cross.

6

30.     Providers, including pharmacies, entered into contractual relationships with PBMs, including Express Scripts and CVS Caremark, either directly or indirectly. If indirectly, providers first contracted with pharmacy network groups, such as Epic Pharmacy Network, Inc. or Good Neighbor Pharmacy, which then contracted with PBMs on behalf of providers. Providers, whether directly or indirectly, by contracting with PBMs, agreed to comply with all applicable laws, rules, and regulations, including all applicable federal and state anti-kickback laws.

31.     For prescription drugs, including compounded medications, to be reimbursed, health care benefit programs required that prescription drugs, including compounded medications, be dispensed pursuant to valid prescriptions and be medically necessary for the treatment of covered illnesses or conditions. In other words, health care benefit programs would not reimburse prescription drugs, including compounded medications, which were not medically necessary or dispensed without valid prescriptions.

32.     Deductibles were the annual amounts that beneficiaries and members paid for health care services before health care benefit programs covered the costs of any health care services or items received. Irrespective of whether deductibles had been met by beneficiaries and members, copayments, which were set by the health care benefit programs, were the monetary amounts or percentages paid by beneficiaries and members for health care services and items received. In other words, copayments were the beneficiaries' and members' share of the costs for the services and items received.

33.     Most, if not all, PBMs, including Express Scripts and CVS Caremark, required participating pharmacies to collect and make good faith efforts to collect copayments from beneficiaries and members at the time of billing, and specified that copayments could not be systematically waived or reduced.

34. Consistent copayment collection was a fraud prevention measure, as copayments gave beneficiaries and members financial incentives to reject medications that were not medically necessary or had little to no value to beneficiaries' and members' treatments.

35. Upon receiving prescriptions, pharmacies submitted claims for dispensing prescription drugs to health care benefit programs or PBMs. Health care benefit programs or PBMs reimbursed pharmacies at specified rates, minus any copayments to be paid by beneficiaries. Specifically, beginning in or around January 2012, health care benefit programs permitted compounding pharmacies to submit claims and be reimbursed for each individual ingredient included in compounded medications. In other words, the more ingredients pharmacies included in the compounded medications, the higher the reimbursements pharmacies received from the health care benefit programs or PBMs.

36. Electronic claims submitted to PBMs by pharmacies located in Mississippi, Alabama, Texas, or Utah necessarily traveled via interstate wire to be adjudicated. For example, regardless of the location of the pharmacies that provided pharmacy benefits, Express Scripts adjudicated claims submitted electronically in Middlesex County, New Jersey, and CVS Caremark adjudicated claims submitted electronically in Maricopa County, Arizona.

**Relevant Pharmacies**

37. Pharmacy 1, incorporated in 2012 and located in Hinds and Madison Counties, Mississippi, was a pharmacy that specialized in the production of compounded medications. **WALTERS**, through a company co-owned by **WALTERS**, procured prescriptions for compounded medications, which it sent to Pharmacy 1. Pharmacy 1 contracted with TRICARE, through Express Scripts, to provide health care services and items to beneficiaries.

38. Advantage Pharmacy, LLC, d/b/a Advantage Medical and Pharmacy ("Advantage

8

Pharmacy"), formed in 2008 and located in Lamar County, Mississippi, was initially an open-door, retail pharmacy that, in or around late 2012, shifted its business focus to the production of compounded medications. **WALTERS**, through companies owned and controlled by **WALTERS**, co-owned Advantage Pharmacy and, through other companies owned and controlled by **WALTERS**, procured prescriptions for compounded medications for Advantage Pharmacy. Advantage Pharmacy contracted with TRICARE, through Express Scripts, to provide health care services and items to beneficiaries.

39.     Sunflower Discount Pharmacy, LLC ("Sunflower Pharmacy"), formed in 2012 and physically located in Sunflower County, Mississippi, was an open-door, retail pharmacy. **WALTERS** assumed control of Sunflower Pharmacy in approximately 2013, and converted its primary business to the production of compounded medications. **WALTERS**, through other companies owned and controlled by **WALTERS**, procured prescriptions for compounded medications for Sunflower Pharmacy. Sunflower Pharmacy contracted with TRICARE, through Express Scripts, to provide health care services and items to beneficiaries.

40.     Medworx Compounding, LLC ("Medworx Pharmacy"), formed in 2012 and located in Madison County, Mississippi, was an open-door, retail pharmacy that specialized in the production of compounded medications. **WALTERS**, through companies owned by co-conspirators, controlled Medworx Pharmacy and, through other companies owned and controlled by **WALTERS**, procured prescriptions for compounded medications for Medworx Pharmacy. Medworx Pharmacy contracted with TRICARE, through Express Scripts, to provide health care services and items to beneficiaries.

41.     Advantage Medical Infusion, LLC, d/b/a AMI Rx ("AMI Pharmacy"), formed in 2008 and located in Lamar County, Mississippi was an open-door, retail pharmacy that, in or around

9

2014, shifted its business focus to the production of compounded medications. **WALTERS**, through companies owned and controlled by **WALTERS**, controlled AMI Pharmacy and, through other companies owned and controlled by **WALTERS**, procured prescriptions for compounded medications for AMI Pharmacy. AMI Pharmacy contracted with TRICARE, through Express Scripts, to provide health care services and items to beneficiaries.

42.     CFK, Inc., d/b/a Prescription Plus Pharmacy or The Medicine Shoppe ("CFK Pharmacy"), formed in 1988 and located in Davis County, Utah, was an open-door, retail pharmacy. In or around late 2014, **WALTERS** purchased CFK Pharmacy and shifted its business focus to the production of compounded medications. **WALTERS**, through a co-conspirator's ownership, controlled CFK Pharmacy and, through other companies owned and controlled by **WALTERS**, procured prescriptions for compounded medications for CFK Pharmacy. CFK Pharmacy contracted with TRICARE, through Express Scripts, to provide health care services and items to beneficiaries.

### Relevant Entities

43.     Prime Care Marketing, LLC ("Prime Care Marketing"), formed in 2012 and located in Lamar County, Mississippi, solicited and recruited practitioners to write prescriptions for compounded medications to be dispensed by Pharmacy 1, Advantage Pharmacy, Sunflower Pharmacy, and Medworx Pharmacy. **WALTERS** co-owned Prime Care Marketing.

44.     Total Care Marketing, LLC ("Total Care Marketing"), formed in 2012 and located in Lamar County, Mississippi, solicited and recruited practitioners to write prescriptions for compounded medications to be dispensed by Advantage Pharmacy, Sunflower Pharmacy, Medworx Pharmacy, and AMI Pharmacy. **WALTERS** co-owned Total Care Marketing.

45.     Innovative Management Solutions, LLC, formerly, Innovative Marketing Solutions,

LLC ("Innovative Management Solutions"), formed in 2014 and located in Sunflower County, Mississippi, solicited and recruited practitioners to write prescriptions for compounded medications to be dispensed by Sunflower Pharmacy and Medworx Pharmacy. Through a co-conspirator's ownership, **WALTERS** exerted control over Innovative Management Solutions.

46. BNSMTW, LLC ("BNSMTW"), formed in 2015 and located in Lamar County, Mississippi, was co-owned by **WALTERS**, and was an entity through which **WALTERS**, and others, managed and controlled AMI Pharmacy.

47. Affordable Medication Solutions, LLC ("AMS"), formed in 2014 and located in Ouachita Parish, Louisiana, purportedly provided copayment assistance for compounded medications prescribed to beneficiaries and members. In reality, AMS did not provide copayment assistance, but simply made it appear to health care benefit programs that beneficiaries' and members' copayments, or portions thereof, were covered by AMS, purportedly through manufacturers' and wholesalers' coupons.

48. DWWW, LLC ("DWWW"), formed in 2013 and located in Lamar County, Mississippi, was co-owned and controlled by **WALTERS**, and was used to receive proceeds from Advantage Pharmacy.

49. S&W Ventures, LLC ("S&W Ventures"), formed in 2014, was headquartered in Lubbock County, Texas, and principally operated from Lamar County, Mississippi. S&W Ventures, although owned by co-conspirators, was controlled by **WALTERS**, and was used to receive proceeds from Medworx Pharmacy and CFK Pharmacy.

50. Medworx Sunflower, LLC ("Medworx Sunflower"), formed in 2014, with its registered agent in Carson City, Nevada, was co-owned and controlled by **WALTERS**, and was used to receive proceeds from Sunflower Pharmacy, Medworx Pharmacy, and CFK Pharmacy.

51.     Dippers, LLC ("Dippers"), formed in 2014 and located in Walton County, Florida, was owned by co-conspirators and controlled by **WALTERS**, and was used to receive proceeds from Innovative Management Solutions.

52.     Walters Holdings, LLC ("Walters Holdings"), formed in 2013 and located in Lamar County, Mississippi, was owned and controlled by **WALTERS**, and was primarily used as a real estate holding company and further used to receive proceeds from, among other entities, Medworx Sunflower.

53.     Wade Walters Consulting, Inc. ("Walters Consulting"), formed in 2003 and located in Lamar County, Mississippi, was owned and controlled by **WALTERS**, and was used to receive proceeds from, among other entities, Medworx Pharmacy, Prime Care Marketing, Total Care Marketing, DWWW, S&W Ventures, Medworx Sunflower, BNSMTW, and Walters Holdings.

54.     Intellectual Property Management Services, LLC ("IPMS"), formed in 2013 and located in St. Joseph County, Indiana, was used to receive proceeds from, among others, Walters Consulting and S&W Ventures.

55.     IPMSI Holdings, LLC ("IPMSI Holdings"), formed in 2013 and located in Carson City, Nevada, was used by **WALTERS** as a holding company for IPMSI Holdings Series Limited Liability Companies.

56.     IPMSI Holdings, Series C, LLC ("IPMSI Series C"), formed in 2016 and located in Lamar County, Mississippi, was used by **WALTERS** to receive proceeds from IPMS.

57.     WW QP Holdings, LLC ("WWQP"), formed in 2015 and located in Maricopa County, Arizona, was used by **WALTERS** to receive proceeds from IPMSI Series C.

58.     DW QP Holdings, LLC ("DWQP"), formed in 2015 and located in Maricopa County, Arizona, was used by **WALTERS** to receive proceeds from IPMSI Series C.

59.   TW QP, LLC ("TWQP"), formed in 2015 and located in Maricopa County, Arizona, was used by **WALTERS** to receive proceeds from IPMSI Series C.

60.   HH QP, LLC ("HHQP"), formed in 2015 and located in Maricopa County, Arizona, was used by **WALTERS** to receive proceeds from IPMSI Series C.

61.   AF QP, LLC ("AFQP"), formed in 2015 and located in Maricopa County, Arizona, was used by **WALTERS** to receive proceeds from IPMSI Series C.

62.   National Financial Services, LLC ("NFS"), formed in New Castle County, Delaware, was an investment management company.   Between at least January 2014 and January 21, 2016, IPMSI Series C held accounts at NFS, including but not limited to account Nos. 5270, 1519, 1520, 1522, 1523, 1524, and 1525.  Between at least June 2015 and January 21, 2016, WWQP held accounts at NFS, including but not limited to account No. 4625.  Between at least June 2015 and January 21, 2016, DWQP held accounts at NFS, including but not limited to account Nos. 4616, 4617, 4620, 4622, 4626, and 4627.  Between at least August 2015 and January 21, 2016, TWQP held accounts at NFS, including but not limited to account Nos. 4903, 4907, 4910, 4912, and 4913. Between at least August 2015 and January 21, 2016, HHQP held accounts at NFS, including but not limited to account Nos. 4882, 4883, 4884, 4885, and 4886.  Between at least August 2015 and January 21, 2016, AFQP held accounts at NFS, including but not limited to account Nos. 4902, 4906, 4908, 4909, and 4911.

63.   Performance Aviation, LLC, formed in 2012 and registered in Lamar County, Mississippi, was used by **WALTERS** as a holding company for various aircraft.

### Relevant Individuals

64.   Hope Thomley ("Thomley") of Lamar County, Mississippi, and companies owned and controlled by Thomley, co-owned Total Care Marketing, Advantage Pharmacy, Prime Care

13

Marketing, and BNSMTW.

65.     Glenn Doyle Beach, Jr. ("Beach"), of Lamar County, Mississippi, and companies owned and controlled by Beach, co-owned Advantage Pharmacy, Total Care Marketing, and BNSMTW.

66.     Jason May ("May"), of Lamar County, Mississippi, was a pharmacist licensed to dispense pharmaceuticals in the state of Mississippi, and was the Pharmacist-in-Charge ("PIC") of Advantage Pharmacy. May, and companies owned and controlled by May, co-owned Advantage Pharmacy and BNSMTW.

67.     Thomas Spell, Jr. ("Spell"), of Madison County, Mississippi, was a pharmacist licensed to dispense pharmaceuticals in the state of Mississippi. Spell, and companies owned and controlled by Spell, co-owned Medworx Pharmacy, S&W Ventures, and Medworx Sunflower.

68.     Marco Moran ("Moran"), of Hinds County, Mississippi, was a pharmacist licensed to dispense pharmaceuticals in the state of Mississippi. Moran, and companies owned and controlled by Moran, co-owned Medworx Pharmacy.

69.     Joseph Wiley, II ("Wiley"), of Ouachita Parish, Louisiana, was a pharmacist licensed to dispense pharmaceuticals in the state of Louisiana and owned and operated AMS.

70.     Gregory Parker ("Parker"), of Jones County, Mississippi, was a licensed nurse practitioner in the state of Mississippi and had the ability to prescribe medications. Parker co-owned Prime Care Marketing.

71.     Brantley Nichols, D.M.D. ("Nichols"), of Lafayette County, Mississippi, was licensed to practice dentistry in the state of Mississippi and had the ability to prescribe medications. Nichols co-owned Prime Care Marketing.

72.     Kakra Gyambibi, M.D. ("Gyambibi"), of Montgomery County, Maryland, was a

14

physician licensed to practice medicine in the state of Connecticut and had the ability to prescribe medications.

73.  Amy Kirk ("Kirk"), of Franklin County, Ohio, was a licensed nurse practitioner in the state of Ohio and had the ability to prescribe medications.

74.  Co-conspirator 1, of Hinds County, Mississippi, was a pharmacist licensed to dispense pharmaceuticals in the state of Mississippi and co-owned Pharmacy 1.

75.  Co-conspirator 2, of Lee County, Mississippi, was a physician licensed to practice medicine in the state of Mississippi and had the ability to prescribe medications. Co-conspirator 2 co-owned Prime Care Marketing.

76.  Co-conspirator 3, of Lamar County, Mississippi, was a physician licensed to practice medicine in the state of Mississippi and had the ability to prescribe medications. Co-conspirator 3 co-owned Prime Care Marketing.

77.  Co-conspirator 4, of Sunflower County, Mississippi, co-owned Innovative Management Solutions.

78.  Co-conspirator 5, of Lamar County, Mississippi, co-owned DWWW and S&W Ventures, and, at **WALTERS'** direction and, through ownership of S&W Ventures, was a nominee owner of Medworx Pharmacy. Co-conspirator 5 was the sole owner of DWQP.

79.  Co-conspirator 6, of Lauderdale County, Mississippi, was a physician licensed to practice medicine in the states of Mississippi, Alabama, and Texas and had the ability to prescribe medications.

80.  Co-conspirator 7, of Lamar County, Mississippi, was a pharmacist licensed to dispense pharmaceuticals in the state of Mississippi and was employed by Advantage Pharmacy. Co-conspirator 7 was the PIC and nominee owner of AMI Pharmacy.

15

81.     Co-conspirator 8, formerly of Salt Lake County, Utah, at **WALTERS'** direction, was the nominee owner of CFK Pharmacy. Co-conspirator 8 owned AFQP and also co-owned Dippers.

82.     Co-conspirator 9, of Lubbock County, Texas, was an attorney licensed to practice law in the state of Texas.

83.     Co-conspirator 10, of Palm Beach County, Florida, marketed the services of IPMS to **WALTERS** and others.

84.     Co-conspirator 11, of Roanoke County, Virginia, owned HHQP and also co-owned Dippers.

85.     Co-conspirator 12, of Lamar County, Mississippi, owned TWQP and also co-owned Dippers.

86.     Co-conspirator 13, of Lamar County, Mississippi, was a certified public accountant who provided accounting services to **WALTERS**.

87.     Co-conspirator 14, of Lamar County, Mississippi, was an associate of and provided financial services to **WALTERS**.

### Relevant Financial Institutions

88.     The Citizens National Bank of Meridian ("Citizens Bank") was a financial institution within the meaning of Title 18, United States Code, Section 20, the deposits of which were insured by the Federal Deposit Insurance Corporation. Citizens Bank was headquartered in Mississippi, and maintained branch locations throughout the Southern District of Mississippi. Between at least May 2008 and January 21, 2016, Advantage Pharmacy held accounts at Citizens Bank, including but not limited to account No. 3786.

89.     BankPlus ("BankPlus") was a financial institution within the meaning of Title 18, United States Code, Section 20, the deposits of which were insured by the Federal Deposit

Insurance Corporation. BankPlus was headquartered in Mississippi, and maintained branch locations throughout the Southern District of Mississippi. Between at least July 2014 and January 21, 2016, Medworx held accounts at BankPlus, including but not limited to account No. 2033.

90.    Wells Fargo Bank, N.A. ("Wells Fargo") was a financial institution within the meaning of Title 18, United States Code, Section 20, the deposits of which were insured by the Federal Deposit Insurance Corporation. Wells Fargo was headquartered in South Dakota and maintained branch locations throughout the Southern District of Mississippi, including in Lamar County. Between at least January 2015 and January 21, 2016, Medworx Pharmacy held accounts at Wells Fargo, including but not limited to account No. 9266. Between at least October 2009 and January 21, 2016, CFK Pharmacy held accounts at Wells Fargo, including but not limited to account No. 1597. Between at least August 2014 and January 21, 2016, S&W Ventures held accounts at Wells Fargo, including but not limited to account No. 4991. Between at least October 2014 and January 21, 2016, Dippers held accounts at Wells Fargo, including but not limited to account No. 9191. Between at least September 2014 and January 21, 2016, Co-conspirator 4 held accounts at Wells Fargo, including but not limited to account No. 3864. Between at least December 2013 and January 21, 2016, IPMS held accounts at Wells Fargo, including but not limited to account No. 6960.

91.    Planters Bank & Trust Company ("Planters Bank") was a financial institution within the meaning of Title 18, United States Code, Section 20, the deposits of which were insured by the Federal Deposit Insurance Corporation. Planters Bank was headquartered in Mississippi and maintained branch locations in the Northern District of Mississippi. Between at least November 2012 and January 21, 2016, Sunflower Pharmacy held accounts at Planters Bank, including but not limited to account No. 0802. Between at least February 2014 and January 21, 2016, Innovative

Management Solutions held accounts at Planters Bank, including but not limited to account No. 1024.

92. The First, A National Banking Association ("The First") was a financial institution within the meaning of Title 18, United States Code, Section 20, the deposits of which were insured by the Federal Deposit Insurance Corporation. The First was headquartered in Mississippi, and maintained branch locations throughout the Southern District of Mississippi. Between at least September 2012 and January 21, 2016, Total Care Marketing held accounts at The First, including but not limited to account No. 1365. Between at least March 2015 and January 21, 2016, BNSMTW held accounts at The First, including but not limited to account No. 2082. Between at least September 2014 and January 21, 2016, IPMSI Series C held accounts at The First, including but not limited to account No. 2454.

93. Regions Bank ("Regions Bank") was a financial institution within the meaning of Title 18, United States Code, Section 20, the deposits of which were insured by the Federal Deposit Insurance Corporation. Regions Bank was headquartered in Alabama and maintained branch locations throughout the Southern District of Mississippi, including in Lamar County. Between at least September 2001 and January 21, 2016, **WALTERS** held accounts at Regions Bank, including but not limited to account No. 8418. Between at least September 2012 and January 21, 2016, Prime Care Marketing held accounts at Regions Bank, including but not limited to account No. 9290. Between at least February 2013 and January 21, 2016, DWWW held accounts at Regions Bank, including but not limited to account No. 9401. Between at least August 2012 and January 21, 2016, Walters Consulting held accounts at Regions Bank, including but not limited to account Nos. 0052 and 9629. Between at least October 2014 and January 21, 2016, Medworx Sunflower held accounts at Regions Bank, including but not limited to account No. 3218. Between at least

18

November 2014 and January 21, 2016, Sunflower Pharmacy held accounts at Regions Bank, including but not limited to account No. 3528. Between at least December 2015 and January 21, 2016, Walters Holdings held accounts at Regions Bank, including but not limited to account No. 4385. Between at least August 2015 and January 21, 2016, TWQP held accounts at Regions Bank, including but not limited to account No. 4822. Between at least August 2015 and January 21, 2016, HHQP held accounts at Regions Bank, including but not limited to account No. 4806. Between at least August 2015 and January 21, 2016, AFQP held accounts at Regions Bank, including but not limited to account No. 4814.

94.     Magnolia State Bank ("Magnolia") was a financial institution within the meaning of Title 18, United States Code, Section 20, the deposits of which were insured by the Federal Deposit Insurance Corporation. Magnolia was headquartered in Mississippi and maintained branch locations throughout the Southern District of Mississippi. Between at least February 2014 and January 21, 2016, Walters Holdings held accounts at Magnolia, including but not limited to account No. 1072.

95.     PriorityOne Bank ("PriorityOne") was a financial institution within the meaning of Title 18, United States Code, Section 20, the deposits of which were insured by the Federal Deposit Insurance Corporation. PriorityOne was headquartered in Mississippi, and maintained branch locations throughout the Southern District of Mississippi. Between at least February 2014 and January 21, 2016, AMI Pharmacy held accounts at PriorityOne, including but not limited to account No. 2814. Between at least May 2015 and January 21, 2016, BNSMTW held accounts at PriorityOne, including but not limited to account No. 6658.

96.     1st Source Bank ("First Source Bank") was a financial institution within the meaning of Title 18, United States Code, Section 20, the deposits of which were insured by the Federal

Deposit Insurance Corporation. First Source Bank was headquartered in Indiana and maintained branch locations in Indiana, Michigan, and Florida. Between at least November 2013 and January 21, 2016, IPMS held accounts at First Source Bank, including but not limited to account No. 6883.

## THE FRAUDULENT SCHEME

### Overview

97.    **WALTERS** and his co-conspirators engaged in a scheme and artifice to defraud the United States, through TRICARE and other health care benefit programs, by: (a) offering, paying, soliciting, and receiving kickbacks and bribes in exchange for arranging and recommending high-margin compounded medications to be dispensed to beneficiaries and members by Pharmacy 1, Advantage Pharmacy, Sunflower Pharmacy, Medworx Pharmacy, AMI Pharmacy, and CFK Pharmacy; (b) dispensing and causing the dispensing of medically unnecessary compounded medications to beneficiaries and members via the United States Postal Service or any private or commercial interstate carrier (collectively, "interstate carriers"); (c) submitting and causing the submission of false and fraudulent claims to TRICARE and other health care benefit programs; (d) receiving and obtaining the reimbursements paid by TRICARE and other health care benefit programs based on the false and fraudulent claims submitted; and (e) concealing the offering, paying, soliciting, and receiving of kickbacks and bribes, the dispensing of medically unnecessary compounded medications via interstate carriers, and the submission of false and fraudulent claims to health care benefit programs.

### Purpose of the Scheme and Artifice

98.    It was a purpose of the scheme and artifice for **WALTERS** and his co-conspirators to unlawfully enrich themselves.

20

**Manner and Means of the Scheme and Artifice**

99.    The manner and means by which **WALTERS** and his co-conspirators sought to accomplish the objects and purpose of the scheme and artifice included, among other things:

Prime Care Marketing

100.    In or around August 2012, **WALTERS** learned of the high reimbursements paid to compounding pharmacies by health care benefit programs for the dispensation of compounded medications, and the lucrative payments received by individuals who procured prescriptions for these compounded medications on behalf of such pharmacies ("recruiters").

101.    Thereafter, **WALTERS**, together with Thomley, engaged Beach and other owners of Advantage Pharmacy, and, separately, engaged Co-conspirator 1 and other owners of Pharmacy 1, to determine whether those pharmacies had an interest in compounding medications, and, if so, to ascertain the potential reimbursements to the pharmacies for the dispensation of compounded medications, and ultimately the potential payments to the recruiters.

102.    In an effort to capitalize on the reimbursements paid for compounded medications, on or about September 14, 2012, **WALTERS** formed Prime Care Marketing.

103.    In addition to recruiting a separate recruiting group ("Group 1") to join Prime Care Marketing, **WALTERS** targeted and solicited practitioners, several of whom were his acquaintances, such as Nichols, Parker, and Co-conspirator 2, to join Prime Care Marketing by offering each practitioner an ownership interest.

Pharmacy 1

104.    **WALTERS**, on behalf of Prime Care Marketing, entered into a contract with Pharmacy 1 to procure prescriptions for compounded medications in exchange for a percentage of the reimbursements received by Pharmacy 1 for the prescriptions obtained by Prime Care Marketing

and filled by Pharmacy 1 ("Pharmacy 1 Contract").

105.   Among other things, the Pharmacy 1 Contract shifted Pharmacy 1's contractual obligations with PBMs to collect copayments onto Prime Care Marketing for prescriptions that Prime Care Marketing procured.  In other words, rather than Pharmacy 1 collecting copayments from beneficiaries and members as required by PBMs, **WALTERS**, on behalf of Prime Care Marketing, agreed to collect and remit to Pharmacy 1 the full copayments due in connection with Pharmacy 1 dispensing the compounded medications.

106.   **WALTERS**, on behalf of Prime Care Marketing, provided to Pharmacy 1 specific formulas for compounded medications, as previously used by Group 1, due to the high reimbursement amounts and regardless of any proven medical efficacy ("high-margin compounded medications").

107.   These high-margin compounded medications included numerous active and inactive ingredients, including ketamine, a Schedule III controlled substance, and tramadol, a Schedule IV controlled substance.  Some of these ingredients were included in the compounded medications solely to increase the reimbursement amounts, despite these ingredients having no medical efficacy as utilized.

108.   Although compounded medications were required to be individualized to the needs of specific patients to be exempt from FDA approval, Prime Care Marketing, and others, created pre-printed, check-the-box prescription pads encouraging and directing practitioners to prescribe set formulas of these high-margin compounded medications produced and dispensed by Pharmacy 1.

109.   **WALTERS**, despite knowing that remuneration could not be paid or received for referring prescriptions to Pharmacy 1 for beneficiaries, nevertheless, through his ownership of Prime Care Marketing, solicited and received remuneration, namely, kickbacks and bribes, from

Pharmacy 1 in exchange for referring prescriptions authorizing the dispensing of high-margin compounded medications to beneficiaries.

110.   In turn, through his ownership of Prime Care Marketing, **WALTERS** offered and paid, and caused to be paid, kickbacks and bribes to individuals at every stage of the distribution process: (a) to practitioners for prescribing high-margin compounded medications; (b) to recruiters for referring such prescriptions to Pharmacy 1; and (c) to beneficiaries for receiving these high-margin compounded medications.  On occasion, kickbacks and bribes paid to practitioners took the form of all-expenses paid hunting trips and expensive hunting equipment.

111.   Despite beneficiaries and members having the ultimate choice in providers, including pharmacies, due to the kickbacks paid by Pharmacy 1 to **WALTERS** and Prime Care Marketing, and due to the kickbacks paid by **WALTERS** and Prime Care Marketing to practitioners and recruiters, beneficiaries and members were denied the ability to choose which pharmacy, if any, they desired to actually fill their prescriptions.

112.   For the purpose of increasing Prime Care Marketing's revenue from Pharmacy 1, Nichols, Parker, Co-conspirator 2, and Co-conspirator 3, as Prime Care Marketing co-owners, prescribed high-margin compounded medications to beneficiaries and members, which were ultimately dispensed by Pharmacy 1.

113.   On occasion, and at **WALTERS'** direction, practitioners, including Nichols, prescribed high-margin compounded medications to beneficiaries and members, including family members of **WALTERS**, who were never examined and where there was no medical necessity for the high-margin compounded medications.

114.   Between approximately September 2012 and May 2013, Prime Care Marketing procured prescriptions, typically authorizing numerous automatic refills, for high-margin

23

compounded medications from practitioners, for beneficiaries and members, which were ultimately dispensed by Pharmacy 1 to beneficiaries and members via interstate carriers.

115. During that time period, **WALTERS** and his co-conspirators caused Pharmacy 1 to submit false and fraudulent claims to health care benefit programs, including TRICARE, through interstate wire transmissions, ultimately receiving approximately $9,818,847.93. Specifically, TRICARE reimbursed to Pharmacy 1 approximately $2,301,901.60 based on these false and fraudulent claims, which was approximately twenty-three percent of total reimbursements.

116. Despite the terms of the Pharmacy 1 Contract, Prime Care Marketing did not collect copayments from beneficiaries and members who received these high-margin compounded medications from Pharmacy 1. When Pharmacy 1 demanded that Prime Care Marketing remit to Pharmacy 1 the copayments associated with the high-margin compounded medications dispensed, **WALTERS**, on behalf of Prime Care Marketing, refused, and ultimately discontinued doing business with Pharmacy 1.

<u>Total Care Marketing and Advantage Pharmacy</u>

117. In or around September 2012, Thomley formed Total Care Marketing, and in or around October 2012, Thomley and **WALTERS**, on behalf of Total Care Marketing, contracted with Advantage Pharmacy to procure prescriptions for compounded medications to be dispensed by Advantage Pharmacy in exchange for a percentage of the reimbursements received by Advantage Pharmacy.

118. In or around February 2013, **WALTERS** purchased an ownership interest in Advantage Pharmacy.

119. **WALTERS** provided to Advantage Pharmacy and Total Care Marketing the formulas for the high-margin compounded medications, and began using at Advantage Pharmacy the

preprinted, check-the-box prescription pads created by Prime Care Marketing and others.

120.   Advantage Pharmacy, in anticipation of receiving prescriptions for certain high-margin compounded medications, manufactured these compounded medications prior to receiving prescriptions, and without having beneficiaries' and members' individual medical needs identified.

121.   In or around May 2013, when **WALTERS** discontinued Prime Care Marketing's relationship with Pharmacy 1, **WALTERS** acquired approximately a forty percent ownership interest of Total Care Marketing from Thomley, and, in exchange, provided to Thomley a forty percent ownership interest of Prime Care Marketing.  At that time, Prime Care Marketing began procuring prescriptions for compounded medications for Advantage Pharmacy; however, as Total Care Marketing had the exclusive contract to procure prescriptions for compounded medications on behalf of Advantage Pharmacy, prescriptions obtained by Prime Care Marketing were funneled to Advantage Pharmacy through Total Care Marketing.

122.   As the reimbursement rates changed for the ingredients included in the high-margin compounded medications, Advantage Pharmacy, namely through Beach and May as the PIC, changed the formulas to maximize reimbursements for these compounded medications, which resulted in the preprinted, check-the box prescription pads being updated from time to time.  Prior to preprinted prescriptions pads being printed and circulated, however, **WALTERS** routinely communicated with practitioners, including Parker, about not only which ingredients needed to be included, but also how much of the particular ingredients needed to be included in the compounded medications to maximize reimbursement.   In other words, **WALTERS**, as a co-owner of Advantage Pharmacy, Total Care Marketing, and Prime Care Marketing, and not as a medical professional, directed practitioners on what to prescribe to beneficiaries and members.

123.   **WALTERS**, despite knowing that it was unlawful to pay or receive remuneration for

referring prescriptions to Advantage Pharmacy for beneficiaries, nevertheless, through his ownership of Total Care Marketing and Prime Care Marketing, solicited and received kickbacks and bribes from Advantage Pharmacy in exchange for referring prescriptions authorizing the dispensing of high-margin compounded medications to beneficiaries. Also, through his ownership of Advantage Pharmacy, Total Care Marketing, and Prime Care Marketing, **WALTERS** offered and paid, and caused to be paid, kickbacks and bribes to practitioners, recruiters, and beneficiaries for the prescribing, referring, and receiving of high-margin compounded medications.

124.   Although **WALTERS** and others attempted to disguise kickbacks and bribes to practitioners as "ownership distributions" of the various purported "marketing" companies, such "ownership distributions" were a ruse. Instead, the payments to practitioners were predicated on the volume of prescriptions they signed authorizing the high-margin compounded medications.

125.   For the purpose of increasing Advantage Pharmacy's, Total Care Marketing's, and Prime Care Marketing's revenue, Nichols, Parker, and Co-conspirator 2, as Prime Care Marketing co-owners, prescribed high-margin compounded medications to beneficiaries and members, which were ultimately dispensed by Advantage Pharmacy.

126.   On occasion, and at **WALTERS'** direction, practitioners, including Nichols, Parker, and Co-conspirator 3, prescribed high-margin compounded medications to beneficiaries and members who were never examined and where there was no medical necessity for the high-margin compounded medications.

127.   Specifically, at **WALTERS'** direction and with **WALTERS'** knowledge, practitioners, including Nichols and Parker, pre-signed blank prescriptions knowing that owners of Total Care Marketing and other non-medical professionals would subsequently complete those prescriptions, fraudulently indicating that medical necessity existed for the high-margin compounded

26

medications, and that the compounded medications should be dispensed.

128. With knowledge of its contractual obligation with the PBMs to collect full copayments, Advantage Pharmacy, when dispensing high-margin compounded medications, initially sent invoices packaged with the compounded medications to beneficiaries and members soliciting the remittance of copayments to Advantage Pharmacy. In certain instances, due to the average wholesale prices of the ingredients included in the high-margin compounded medications, these copayments were often hundreds of dollars, sometimes exceeding $1,000.00 per prescription.

129. As beneficiaries and members refused to pay these exorbitant copayments and informed Advantage Pharmacy that they wished to discontinue receiving these medications, in an effort to continue dispensing these high-margin compounded medications, Advantage Pharmacy, despite its contractual obligation to collect full copayments, arbitrarily, and without authorization, reduced copayments to $50.00, then subsequently to $15.00. In certain instances, copayments were waived altogether. In other words, despite copayments exceeding hundreds of dollars, Advantage Pharmacy only sought to collect a much smaller amount, or nothing at all, from beneficiaries and members so as to not dissuade beneficiaries and members from agreeing to, and continuing to, receive the high-margin compounded medications.

130. Between approximately September 2012 and approximately January 2016, Total Care Marketing, through its affiliate recruiters, including Prime Care Marketing, procured prescriptions for high-margin compounded medications, typically authorizing numerous refills, from practitioners, for beneficiaries and members, which were ultimately dispensed by Advantage Pharmacy to beneficiaries and members via interstate carriers.

131. **WALTERS** and his co-conspirators caused Advantage Pharmacy to submit false and fraudulent claims to health care benefit programs, including TRICARE, through interstate wire

27

transmissions, ultimately receiving approximately $185,039,792.30. Specifically, TRICARE reimbursed to Advantage Pharmacy approximately $42,252,116.39 based on these false and fraudulent claims, what was approximately twenty-three percent of total reimbursements.

Sunflower Pharmacy

132.   In or around late 2013, due to poor audit performance and other issues, Advantage Pharmacy was not permitted to fill prescriptions in certain states, including Arizona and North Carolina, and was terminated from its contracts with certain PBMs, including CVS Caremark.

133.   Due to the issues encountered at Advantage Pharmacy and desiring more control over pharmaceutical operations than previously held at Advantage Pharmacy, in or around late 2013 and early 2014, **WALTERS** began looking to acquire additional compounding pharmacies, including Sunflower Pharmacy.

134.   In or around early 2014, **WALTERS**, Thomley, Beach, Spell, and others worked with the then-owners of Sunflower Pharmacy and converted it from a retail pharmacy and laboratory into primarily a compounding pharmacy.

135.   On or about January 31, 2014, Innovative Management Solutions was formed as a Mississippi Limited Liability Company, with its principal office in Lafayette County, Mississippi. Although Innovative Management Solutions was owned by Co-conspirator 4, **WALTERS** exercised control over Innovative Management Solutions.

136.   In or around March 2014, **WALTERS**, Spell, and Co-conspirator 4, agreed that Innovative Management Solutions would procure prescriptions for Sunflower Pharmacy, in exchange for sixty percent of the reimbursements received by Sunflower Pharmacy on the prescriptions referred by Innovative Management Solutions.

137.   Upon converting Sunflower Pharmacy into a compounding pharmacy, **WALTERS**, in

28

or around September 2014, formally purchased it, and registered the entity with the Mississippi Secretary of State, identifying its principal office as being located in Lamar County, Mississippi.

138.  **WALTERS** and Thomley provided, and Spell copied, the formulas for high-margin compounded medications from other pharmacies, including Advantage Pharmacy. Spell also formulated new compounded medications based on available ingredients and reimbursement rates, often including extra ingredients to maximize reimbursements, irrespective of the extra ingredients' medical efficacy.

139.  Once Sunflower Pharmacy had the ability to compound medications, **WALTERS** directed Advantage Pharmacy to send to Sunflower Pharmacy the prescriptions Advantage Pharmacy could not fill, including certain out-of-state prescriptions.

140.  Between September 2014 and January 2016, on behalf of Innovative Management Solutions, **WALTERS** negotiated contracts between other recruiters and Innovative Management Solutions wherein other recruiters agreed to receive a percentage of the payments received by Innovative Management Solutions from Sunflower Pharmacy, in exchange for referring prescriptions to Sunflower Pharmacy, through Innovative Management Solutions.

141.  **WALTERS**, despite knowing it was prohibited to pay and receive remuneration for referring prescriptions for beneficiaries to Sunflower Pharmacy, nevertheless, through his control of Innovative Management Solutions, solicited and received kickbacks and bribes from Sunflower Pharmacy in exchange for referring prescriptions authorizing the dispensing of high-margin compounded medications to beneficiaries. Also, through his ownership of Sunflower Pharmacy and his control of Innovative Management Solutions, **WALTERS** offered and paid, and caused to be paid, kickbacks and bribes to practitioners, recruiters, and beneficiaries for the prescribing, referring, and receiving of high-margin compounded medications.

142.    With knowledge of its contractual obligation with the PBMs to collect full copayments, Sunflower Pharmacy, when dispensing high-margin compounded medications, initially sent invoices packaged with the compounded medications to beneficiaries and members soliciting the remittance of copayments to Sunflower Pharmacy.   In certain instances, due to the average wholesale prices of the ingredients included in these high-margin compounded medications, these copayments were often hundreds of dollars, sometimes exceeding $1,000.00 per prescription.

143.    As beneficiaries and members refused to pay these exorbitant copayments and informed Sunflower Pharmacy that they wished to discontinue receiving these medications, in an effort to continue dispensing these high-margin compounded medications, Sunflower Pharmacy, despite its contractual obligation to collect full copayments, arbitrarily, and without authorization, reduced copayments to $50.00, then subsequently to $15.00. In certain instances, copayments were waived altogether.   In other words, despite copayments exceeding hundreds of dollars, Sunflower Pharmacy only sought to collect a much smaller amount, or nothing at all, from beneficiaries and members so as to not dissuade beneficiaries and members from agreeing to, and continuing to, receive the high-margin compounded medications.

144.    Between approximately September 2013 and approximately January 2016, Innovative Management Solutions, Total Care Marketing, Prime Care Marketing, and other recruiters procured prescriptions for high-margin compounded medications, typically authorizing numerous refills, from practitioners, for beneficiaries and members, which were ultimately dispensed by Sunflower Pharmacy to beneficiaries and members via interstate carriers, including beneficiaries and members in the Southern District of Mississippi.

145.    **WALTERS** and his co-conspirators caused Sunflower Pharmacy to submit false and fraudulent claims to health care benefit programs, including TRICARE, through interstate wire

transmissions, ultimately receiving approximately $65,335,628.60. Specifically, TRICARE reimbursed to Sunflower Pharmacy approximately $48,624,390.84 based on these false and fraudulent claims, which represented approximately seventy-four percent of all reimbursements received by Sunflower Pharmacy during that time period.

### Medworx Pharmacy

146. **WALTERS** and Spell, in an effort to continue to increase revenue from high-margin compounded medications, sought opportunity to expand beyond Sunflower Pharmacy. To that end, **WALTERS** and Spell sought to acquire a pharmacy or a business partner who had a membership with a certain pharmaceuticals wholesaler ("Wholesaler 1"), because Wholesaler 1's products listed higher average wholesale prices than its competitors for similar ingredients, and accordingly, these ingredients generated higher reimbursements for member pharmacies.

147. Additionally, **WALTERS** and Spell sought a business partner with access to practitioners who could generate a high volume of prescriptions for high-margin compounded medications.

148. Spell ultimately identified Moran as such person and, in or around mid-2014, Spell, together with **WALTERS** and Moran, acquired an ownership interest in Medworx Pharmacy. **WALTERS**, in an effort to hide his ownership interest in Medworx Pharmacy from the co-owners of Advantage Pharmacy, held his ownership interest through Co-conspirator 5, via S&W Ventures.

149. For Medworx Pharmacy, Spell and others formulated high-margin compounded medications, irrespective of medical efficacy and for the purpose of maximizing reimbursements, this time, using the ingredients sold by Wholesaler 1, and continued to use the pre-printed, check-the-box prescription pads created and distributed to recruiters.

150. Moran had prior experience with compounding medications, and had previously developed formulas for vitamin compounds ("wellness capsules") that were designed to generate, like other compounded medications, exorbitantly high reimbursements. Spell replicated the formulas for these wellness capsules and included the same on Medworx Pharmacy's pre-printed prescription pads.

151. In addition to Moran's membership with Wholesaler 1, Moran was associated with Co-conspirator 6, who, at Moran's direction, and in exchange for kickbacks and bribes, pre-signed numerous blank prescriptions, which Moran later completed, purportedly authorizing the dispensation of high-margin compounded medications. **WALTERS** was aware that Moran had completed, and further encouraged Moran to complete, prescriptions that had been pre-signed by Co-conspirator 6, as this caused high-margin compounded medications to be dispensed and health care benefit programs, including TRICARE, to be billed.

152. In addition to Moran, Medworx Pharmacy, through **WALTERS** and Spell, brought on numerous other recruiters, including a group located in Davidson County, Tennessee ("Group 2"), to procure prescriptions for compounded medications on behalf of Medworx Pharmacy. **WALTERS** negotiated the contracts with, and the commission percentages to be paid to, the various recruiters, including Group 2.

153. Although Medworx Pharmacy initially created its own pre-printed prescription pads, as the reimbursement rates of the various ingredients changed, and as the recruiters utilized multiple versions of pre-printed prescription pads, Medworx Pharmacy ceased creating and using its own pre-printed pads, but rather used the pre-printed prescriptions provided by the recruiters.

154. Nevertheless, Medworx Pharmacy continued to alter formulas based on which ingredients reimbursed at the highest rates, and produced these high-margin compounded

medications without identifying any individualized need. To that end, even though certain prescriptions received by Medworx Pharmacy called for particular formulas to be dispensed, on occasion, Medworx Pharmacy dispensed whichever formulas of compounded medications reimbursed at the highest rates. In other words, occasionally, and for the sole purpose of increasing revenue, Medworx Pharmacy dispensed compounded medications other than as purportedly prescribed.

155. Additionally, even though it was apparent to Spell and **WALTERS** that there was no medical necessity for the prescriptions for high-margin compounded medications received by Medworx Pharmacy, Spell, on behalf of Medworx, filled the prescriptions anyway. This was made apparent to Medworx Pharmacy in numerous ways, including when Medworx Pharmacy simultaneously received identical prescriptions for entire families of beneficiaries and members, as well as when Medworx Pharmacy received signed prescriptions from pre-printed pads with every box for every compound checked.

156. Nevertheless, to make Medworx Pharmacy's practice of dispensing compounded medications appear legitimate, Spell directed recruiters, including Group 2, that they could not send to Medworx Pharmacy prescriptions calling for more than three compounded medications to be dispensed simultaneously to any one beneficiary or member.

157. **WALTERS**, despite knowing it was prohibited to pay and receive remuneration for referring prescriptions for beneficiaries to Medworx Pharmacy for beneficiaries, nevertheless, through his ownership of Medworx Pharmacy, offered and paid, and caused to be paid, kickbacks and bribes to practitioners, recruiters, and beneficiaries for the prescribing, referring, and receiving of these high-margin compounded medications.

33

158.    The collection of copayments continued to be problematic for **WALTERS**.  Medworx Pharmacy, like Sunflower Pharmacy and Advantage Pharmacy, did not collect copayments so as not to dissuade beneficiaries and members from receiving the high-margin compounded medications.

159.    When Medworx Pharmacy was audited in or around mid-2014 by a health care benefit program and had its copayment collections scrutinized, Moran and Spell attempted to defeat the audit by making it appear as if copayments had been paid by beneficiaries and members through the use of prepaid debit cards and money orders.  In actuality, with **WALTERS'** knowledge: (a) Spell and Moran purchased prepaid debit cards and money orders, respectively; (b) Spell applied the monies from the debit cards and money orders to outstanding copayment balances; and (c) Spell ultimately reimbursed Moran for the purchasing of the money orders from an account held by Medworx Pharmacy.  In other words, contrary to the contracts signed with Express Scripts and other PBMs, Medworx Pharmacy paid the copayments on behalf of beneficiaries and members through the use of prepaid debit cards and money orders.

160.    As the use of prepaid debit cards and money orders presented significant risk of failing audits, Medworx Pharmacy looked for alternative solutions to its copayment problem, and, at **WALTERS'** suggestion, ultimately utilized the services of Wiley and AMS.  AMS purported to provide a coupon assistance program to beneficiaries and members serving to lower copayments to amounts more likely to be paid.  In order to be legitimate, however, coupon assistance programs required sponsorship by manufacturers or wholesalers of the ingredients used in the compounded medications.  At no time did AMS receive sponsorship from any manufacturers or wholesalers; thus no actual coupon existed, and consequently, no actual assistance was provided to beneficiaries and members.  Rather, as known by **WALTERS**, AMS merely created a paper trail to make it

appear as if Medworx Pharmacy had collected copayments from AMS for beneficiaries and members, when, in reality, it had not, primarily for the purpose of defeating audits.

161. Between June 2014 and approximately January 2016, Moran and other recruiters, including Group 2, procured prescriptions for high-margin compounded medications, typically authorizing numerous refills, from practitioners, including Co-conspirator 6, for beneficiaries and members, which were ultimately dispensed by Medworx Pharmacy to beneficiaries and members via interstate carriers.

162. **WALTERS** and his co-conspirators caused Medworx Pharmacy to submit false and fraudulent claims to health care benefit programs, including TRICARE, through interstate wire transmissions, ultimately receiving approximately $162,906,654.20. Specifically, TRICARE reimbursed to Medworx Pharmacy approximately $123,562,484.45 based on these false and fraudulent claims, which represented approximately seventy-five percent of all reimbursements received by Medworx Pharmacy during that time period.

AMI Pharmacy

163. In a continued effort to circumvent its exclusions with certain PBMs and from dispensing in certain states, as well as to ensure that Advantage Pharmacy continued to maximize its reimbursements by dispensing as many compounded medications as possible, Advantage Pharmacy's owners, including **WALTERS**, looked for additional avenues to dispense compounded medications, including by utilizing an additional pharmacy.

164. To that end, in or around September 2014, Beach, an owner of both Advantage Pharmacy and AMI Pharmacy, purportedly sold AMI Pharmacy to Co-conspirator 7. Co-conspirator 7, as nominee owner, in turn, executed a contract agreeing to dispense the compounded medications that Advantage Pharmacy could not, and further agreed to remit ninety-five percent

of the profits received to Beach and the other owners of Advantage Pharmacy ("Contract 2").

165.   In completing applications to obtain the necessary licensure to dispense compounded medications to beneficiaries and members, Co-conspirator 7, with the Advantage Pharmacy owners' knowledge, hid Advantage Pharmacy owners' involvement in and control over AMI Pharmacy.

166.   In or around March 2015, Beach, May, Thomley, **WALTERS**, and others formed BNSMTW to operate as a purported management company of AMI Pharmacy.   Instead, BNSMTW was used to hold an account to receive monies from AMI Pharmacy representing ninety-five percent of AMI Pharmacy's profits, as per Contract 2.

167.   Between approximately September 2014 and approximately January 2016, Advantage Pharmacy, Total Care Marketing, and other recruiters sent to AMI Pharmacy prescriptions for high-margin compounded medications, typically authorizing numerous refills, which Advantage Pharmacy could not otherwise fill and which were not medically necessary.  AMI Pharmacy, in turn, dispensed the high-margin compounded medications to beneficiaries and members via interstate carriers.

168.   **WALTERS** and his co-conspirators caused AMI Pharmacy to submit false and fraudulent claims to health care benefit programs, including TRICARE, through interstate wire transmissions, ultimately receiving approximately $13,802,897.10.    Specifically, TRICARE reimbursed to AMI Pharmacy approximately $1,586,509.30 based on these false and fraudulent claims, which was approximately eleven percent of all reimbursements received by AMI Pharmacy during that time period.

169.   **WALTERS**, Thomley, Beach, May, and other Advantage Pharmacy owners used AMI Pharmacy to dispense high-margin compounded medications that Advantage Pharmacy was

prohibited by law or contract from dispensing, and to further facilitate the scheme to defraud the United States and other health care benefit programs.

CFK Pharmacy

170.   In an effort to expand the dispensation of compounded medications into California, **WALTERS** sought to acquire another pharmacy with an active license to do so.

171.   In or around late 2014, **WALTERS** identified and ultimately purchased CFK Pharmacy, which was located in Davis County, Utah and held an active license to dispense medications in California, and elsewhere, and placed the pharmacy in the name of Co-conspirator 8 and another. Although **WALTERS** placed CFK pharmacy in the name of Co-conspirator 8 and another, **WALTERS** retained both financial and actual control of the pharmacy.

172.   On or about September 12, 2014, **WALTERS**, and others, formed Medworx Sunflower, a Nevada Limited Liability Company, for the purpose of receiving TRICARE and other health care benefit programs' reimbursements from CFK Pharmacy, and other pharmacies, and, that same day, **WALTERS** executed an operating agreement for Medworx Sunflower, wherein **WALTERS** identified Medworx Sunflower's principal office as being located in Lamar County, Mississippi.

173.   For CFK Pharmacy, Spell and others formulated high-margin compounded medications, irrespective of medical efficacy and for the purpose of maximizing reimbursements. Spell and others continued to alter formulas based on which ingredients reimbursed at the highest rates.

174.   CFK Pharmacy, through **WALTERS** and Spell, solicited numerous other recruiters, including Group 2 and another group located in Bradley County, Tennessee ("Group 3"), to procure prescriptions for compounded medications on behalf of CFK Pharmacy, primarily targeting beneficiaries.   **WALTERS** negotiated the contracts with, and the commission percentages to be paid to, the various recruiters, including Group 3. Group 2, Group 3, and other

37

recruiters, in exchange for a portion of the reimbursements received by CFK Pharmacy on the prescriptions referred by Group 2, Group 3, and other recruiters, ultimately agreed to procure prescriptions for compounded medications for CFK Pharmacy.

175.   Recruiters, including Group 3, paid kickbacks and bribes, in the form of medical director fees, to practitioners in Tennessee, and elsewhere, to prescribe high-margin compounded medications to individuals, including beneficiaries in California, and elsewhere.  Additionally, recruiters, in exchange for kickbacks and bribes, identified and recruited beneficiaries to receive high-margin compounded medications at no cost.  Group 3, and other recruiters, on occasion, paid beneficiaries, typically between $200 and $300 per month to receive these high-margin compounded medications, a practice of which **WALTERS** was aware.

176.   Upon identifying beneficiaries willing to receive the high-margin compounded medications, recruiters, including Group 3, provided beneficiaries' contact and insurance information to practitioners, including practitioners in Tennessee.

177.   Although these practitioners were supposed to consult with and examine beneficiaries, because these beneficiaries were not actual patients of the practitioners, but rather were directly solicited by recruiters, including Group 3, these practitioners often did not examine beneficiaries prior to prescribing high-margin compounded medications.

178.   Recruiters, with **WALTERS'** knowledge and consent, paid beneficiaries to receive these compounded medications, and, similar to other multi-level marketing schemes, further recruited beneficiaries to recruit other beneficiaries to receive these compounded medications.

179.   **WALTERS**, despite knowing that remuneration could not be paid for referring prescriptions for beneficiaries to CFK Pharmacy, nevertheless, through his ownership of CFK Pharmacy, offered and paid, and caused to be paid, kickbacks and bribes to practitioners, recruiters,

and beneficiaries for the prescribing, referring, and receiving of these high-margin compounded medications.

180.  Between approximately December 2014 and approximately January 2016, recruiters, including Group 2 and Group 3, procured prescriptions for high-margin compounded medications from practitioners, including practitioners in Tennessee, for beneficiaries and members, primarily in California, which were ultimately dispensed by CFK Pharmacy to beneficiaries and members via interstate carriers.

181.  **WALTERS** and his co-conspirators caused CFK Pharmacy to submit false and fraudulent claims to health care benefit programs, including TRICARE, through interstate wire transmissions, ultimately receiving approximately $76,245,189.42.  Specifically, TRICARE reimbursed to CFK Pharmacy approximately $71,250,059.44 based on these false and fraudulent claims, which represented approximately ninety-three percent of all reimbursements received by CFK Pharmacy during that time period.

182.  Reimbursements paid to CFK Pharmacy from TRICARE and other health care benefit programs were ultimately transferred into Wells Fargo account No. 9266, held by Medworx Pharmacy, in Lamar County, Mississippi, over which **WALTERS**, through Co-conspirator 5, had signature authority and control.

### Scope of the Scheme and Artifice

183.  Together, Pharmacy 1, Advantage Pharmacy, Sunflower Pharmacy, Medworx Pharmacy, AMI Pharmacy, and CFK Pharmacy fraudulently billed and received from health care benefit programs more than $510 million in reimbursements, including receiving more than $289 million from TRICARE.

184.  The proceeds from the above-described scheme and artifice were funneled through

various entities and bank accounts, but ultimately were distributed to, among others, **WALTERS**, who personally received more than approximately $54 million.

### COUNTS 1-9

### The Scheme and Its Execution

185. Paragraphs 1 through 96 of the Superseding Indictment are re-alleged and incorporated by reference as though fully set forth herein.

186. Beginning in or around August 2012, and continuing through in or around January 2016, in Lamar, Rankin, Hinds, and Newton Counties, in the Southern District of Mississippi, and elsewhere, the defendant,

### WADE ASHLEY WALTERS,

aided and abetted by Nichols, Parker, Thomley, May, Beach, Spell, Moran, Co-Conspirator 1, Co-conspirator 2, Co-conspirator 3, Co-conspirator 4, Co-conspirator 5, Co-conspirator 6, Co-conspirator 7, Co-conspirator 8, Co-conspirator 9, Co-conspirator 10, Co-conspirator 11, Co-conspirator 12, Co-conspirator 13, Co-conspirator 14, and others known and unknown to the Grand Jury, did knowingly execute, and attempt to execute a scheme and artifice with the intent to defraud the United States and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, knowing that the pretenses, representations and promises were false and fraudulent when made, in a contract, subcontract, subsidy, guarantee, insurance, and other form of Federal assistance, the value of such contract, subcontract, subsidy, guarantee, insurance, and form of Federal assistance, and any constituent part thereof, being $1,000,000.00 or more.

187.   The scheme to defraud is more fully described in paragraphs 97 through 184 of this Superseding Indictment and is re-alleged and incorporated by reference as if fully set forth herein.

188.   On or about the dates specified below, in the Southern District of Mississippi, and elsewhere, aided and abetted by others, and aiding and abetting others known and unknown to the Grand Jury, **WALTERS** caused the following not medically necessary compounded medications to be dispensed, and sent and delivered by interstate carrier, and caused corresponding false and fraudulent claims to be submitted to TRICARE, which claims indicated that the dispensed compounded medications were medically necessary, when in reality, as known by **WALTERS**, these compounded medications were not medically necessary, as no examination had been performed by a practitioner prior to the compounded medications being prescribed and dispensed, and claims being submitted to TRICARE, in an attempt to execute, and in execution of the scheme to defraud, as described in paragraph 97 through 184 of this Superseding Indictment, with each execution set forth below forming a separate count:

| Count | Bene-ficiary | Practitioner | Pharmacy | Description of Materially False Representation | Approx. Date Sent or Transmitted |
|-------|--------------|--------------|----------|-----------------------------------------------|----------------------------------|
| 1 | J.A. | Nichols | Pharmacy 1 | Prescription number 102852 | 02/27/2013 |
| 2 | L.A. | Nichols | Pharmacy 1 | Prescription number 102853 | 02/27/2013 |
| 3 | J.P. | Nichols | Pharmacy 1 | Prescription number 103133 | 03/11/2013 |
| 4 | W.P. | Nichols | Pharmacy 1 | Prescription number 103134 | 03/11/2013 |
| 5 | W.P. | Nichols | Advantage Pharmacy | Prescription number 101395 | 05/09/2013 |
| 6 | J.P. | Nichols | Advantage Pharmacy | Prescription number 101396 | 05/09/2013 |
| 7 | L.A. | Nichols | Advantage Pharmacy | Prescription number 110260 | 11/29/2013 |
| 8 | L.A. | Nichols | Advantage Pharmacy | Prescription Number 110261 | 11/29/2013 |
| 9 | L.A. | Nichols | Sunflower Pharmacy | Prescription Number 100256 | 01/09/2014 |

Each of the above is a violation of Title 18, United States Code, Sections 1031(a) and 2.

## COUNT 10

### The Conspiracy and Its Objects

189.   Paragraphs 1 through 96 of this Superseding Indictment are re-alleged and incorporated by reference as though fully set forth herein.

190.   Beginning in or around August 2012, and continuing through in or around January 2016, in Lamar, Hinds, and Madison Counties, in the Southern District of Mississippi, and elsewhere, the defendant,

### WADE ASHLEY WALTERS,

did conspire and agree with Nichols, Parker, Thomley, May, Beach, Spell, Moran, Co-Conspirator 1, Co-conspirator 2, Co-conspirator 3, Co-conspirator 4, Co-conspirator 5, Co-conspirator 6, Co-conspirator 7, Co-conspirator 8, Co-conspirator 9, Co-conspirator 10, Co-conspirator 11, Co-

conspirator 12, Co-conspirator 13, Co-conspirator 14, and with others known and unknown to the Grand Jury, to commit certain offenses against the United States, that is:

a.     to knowingly and willfully execute a scheme and artifice to defraud a health care benefit program affecting commerce, as defined in Title 18, United States Code, Section 24(b), that is, TRICARE and other health care benefit programs, and to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money owned by and under the custody and control of TRICARE and other health care benefit programs, in connection with the delivery of and payment for health care benefits and services, in violation of Title 18, United States Code, Section 1347;

b.     to knowingly and with the intent to defraud devise and intend to devise a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, knowing that the pretenses, representations and promises were false and fraudulent when made, and to knowingly transmit and cause to be transmitted, by means of wire communication in interstate commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such a scheme and artifice, in violation of Title 18, United States Code, Section 1343; and

c.     to knowingly and with the intent to defraud devise and intend to devise a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, knowing that the pretenses, representations and promises were false and fraudulent when made, and to knowingly deposit or cause to be deposited any matter or thing whatever to be sent or delivered by interstate carriers, or took or received therefrom, any such matter or thing for the purpose of executing such scheme and artifice or attempting to do so, in violation of Title 18, United States Code, Section 1341.

## Purpose of the Conspiracy

191.   It was a purpose of the conspiracy for **WALTERS** and his co-conspirators to unlawfully enrich themselves, as described in paragraphs 97 and 98 of this Superseding Indictment, which are re-alleged and incorporated by reference as though fully set forth herein.

## Manner and Means of the Conspiracy

192.   In furtherance of the conspiracy and to accomplish its objects and purpose, the methods, manner, and means that were used are described in paragraphs 99 through 184 of this Superseding Indictment, and incorporated by reference as though fully set forth herein.

All in violation of Title 18, United States Code, Section 1349.

## COUNTS 11-15

## The Scheme and Its Execution

193.   Paragraphs 1 through 96 of the Superseding Indictment are re-alleged and incorporated by reference as though fully set forth herein.

194.   Beginning in or around August 2012, and continuing through in or around January 2016, in Lamar County, in the Southern District of Mississippi, and elsewhere, the defendant,

## WADE ASHLEY WALTERS,

aided and abetted by Nichols, Parker, Thomley, May, Beach, Gyambibi, Kirk, Co-conspirator 7, and others known and unknown to the Grand Jury, did knowingly cause to be transmitted by means of wire communications in interstate commerce, certain writings, signs, signals, pictures and sounds, namely, false and fraudulent claims for high-margin compounded medications dispensed by Advantage Pharmacy and AMI Pharmacy, between Lamar County, Mississippi and Middlesex County, New Jersey or Maricopa County, Arizona.

195.   The scheme to defraud is more fully described in paragraphs 97 through 184 of this

Superseding Indictment and is re-alleged and incorporated by reference as if fully set forth herein.

196.   On or about the dates specified below, in the Southern District of Mississippi, and elsewhere, aided and abetted by others, and aiding and abetting others known and unknown to the Grand Jury, **WALTERS** submitted or caused to be submitted the following wire communications in interstate commerce, namely between Madison County, Mississippi and Middlesex County, New Jersey and Maricopa County, Arizona, in an attempt to execute, and in execution of the scheme, as described in paragraphs 97 through 184 of this Superseding Indictment, with each execution set forth below forming a separate count:

| Count | Bene-ficiary | Practitioner | Pharmacy | Description of Interstate Wire Communication | Approx. Date Transmitted | Approx. Amount Received |
|-------|--------------|--------------|----------|---------------------------------------------|--------------------------|-------------------------|
| 11 | A.H. | Nichols | Advantage Pharmacy | Prescription number 108254 | 09/30/2014 | $11,083.24 |
| 12 | M.G. | Parker | Advantage Pharmacy | Prescription number 117150 | 09/30/2014 | $11,523.56 |
| 13 | S.M. | Nichols | Advantage Pharmacy | Prescription Number 107814 | 10/13/2014 | $10,274.87 |
| 14 | M.R. | Gyambibi | AMI Pharmacy | Prescription Number 101000 | 10/30/2014 | $11,489.29 |
| 15 | R.H. | Kirk | AMI Pharmacy | Prescription Number 103883 | 04/29/2015 | $20,471.71 |

Each of the above is a violation of Title 18, United States Code, Sections 1343 and 2.

## COUNTS 16-18

### The Scheme and Its Execution

197.   Paragraphs 1 through 96 of the Superseding Indictment are re-alleged and incorporated by reference as though fully set forth herein.

198.   Beginning in or around August 2012, and continuing through in or around January 2016, in Lamar County, in the Southern District of Mississippi, and elsewhere, the defendant,

### WADE ASHLEY WALTERS,

45

aided and abetted by Nichols, Parker, Spell, Moran, Co-conspirator 6, and by others known and unknown to the Grand Jury, did knowingly cause to be sent or delivered by the United States Postal Service or any private or commercial interstate carrier, and took and received therefrom high-margin compounded medications.

199.   The scheme to defraud is more fully described in paragraphs 97 through 184 of this Superseding Indictment and is re-alleged and incorporated by reference as if fully set forth herein

200.   On or about the dates specified below, in the Southern District of Mississippi, and elsewhere, aided and abetted by others, and aiding and abetting others known and unknown to the Grand Jury, **WALTERS** caused to be sent or delivered by interstate carriers, and took and received therefrom high-margin compounded medications, in an attempt to execute, and in execution of the scheme, as described in paragraphs 97 through 184 of this Superseding Indictment, with each execution set forth below forming a separate count:

| Count | Bene-ficiary | Practitioner | Pharmacy | Description of Mailing | Approx. Date of Mailing |
|-------|--------------|--------------|----------|------------------------|-------------------------|
| 16 | K.S. | Co-conspirator 6 | Medworx Pharmacy | High-margin compounded medications, bearing prescription numbers 100445, 100446, and 100448, mailed from Medworx Pharmacy, located in Madison County, Mississippi, to K.S., located in Clarke County, Mississippi, via Interstate Carrier. | 10/13/2014 |
| 17 | L.C. | Co-conspirator 6 | Medworx Pharmacy | High-margin compounded medications, bearing prescription numbers 100824 and 100825, mailed from Medworx Pharmacy, located in Madison County, Mississippi, to L.C., located in Lauderdale County, Mississippi, via Interstate Carrier. | 10/13/2014 |

| Count | Bene-ficiary | Practitioner | Pharmacy | Description of Mailing | Approx. Date of Mailing |
|---|---|---|---|---|---|
| 18 | R.S. | Co-conspirator 6 | Medworx Pharmacy | High-margin compounded medications, bearing prescription numbers 100417, 100419, and 100420, mailed from Medworx Pharmacy, located in Madison County, Mississippi, to R.S., located in Lauderdale County, Mississippi, via Interstate Carrier. | 10/23/2014 |

Each of the above is a violation of Title 18, United States Code, Sections 1341 and 2.

## COUNT 19

### The Conspiracy and Its Object

201.   Paragraphs 1 through 184 of the Superseding Indictment are re-alleged and incorporated by reference as though fully set forth herein.

202.   Beginning in or around August 2012, and continuing through in or around January 2016, in Lamar and Madison Counties, in the Southern District of Mississippi, and elsewhere, the defendant,

### WADE ASHLEY WALTERS,

did knowingly and intentionally conspire, confederate, and agree with Nichols, Parker, Thomley, May, Beach, Spell, Moran, Co-Conspirator 1, Co-Conspirator 2, Co-conspirator 6, and other persons known and unknown to the Grand Jury to distribute and dispense, outside the scope of professional practice and not for a legitimate medical purpose, quantities of ketamine, a Schedule III controlled substance, and quantities of tramadol, a Schedule IV controlled substance, in violation of Title 21, United States Code, Section 841(a)(1); all in violation of Title 21, United States Code, Section 846.

### COUNTS 20-21

203.   Paragraphs 1 through 184 of the Superseding Indictment are re-alleged and incorporated by reference as though fully set forth herein.

204.   On or about the dates identified in the table below, in Lamar County, in the Southern District of Mississippi, and elsewhere, the defendant,

## WADE ASHLEY WALTERS,

aided and abetted by Nichols, Thomley, Beach, May, and others known and unknown to the Grand Jury, did knowingly and intentionally distribute and dispense, outside the scope of professional practice and not for a legitimate medical purpose, quantities of a Schedule III controlled substance:

| Count | Beneficiary | Practitioner | Pharmacy | Date | Prescription Number | Controlled Substance |
|-------|-------------|--------------|----------|------|---------------------|----------------------|
| 20 | D.M. | Nichols | Advantage Pharmacy | 10/17/2014 | 124558 | Ketamine |
| 21 | M.M. | Nichols | Advantage Pharmacy | 10/17/2014 | 124560 | Ketamine |

Each of the above is a violation of Title 21, United States Code, Section 841(a)(1) and Title 18, United States Code, Section 2.

## COUNT 22

### The Conspiracy and Its Object

205.   Paragraphs 1 through 184 of the Superseding Indictment are re-alleged and incorporated by reference as though fully set forth herein.

206.   Beginning in or around August 2014, and continuing through in or around December 2015, in Lamar County, in the Southern District of Mississippi, and elsewhere, the defendant,

## WADE ASHLEY WALTERS,

did knowingly and intentionally conspire, confederate, and agree with Parker to distribute and dispense, outside the scope of professional practice and not for a legitimate medical purpose,

48

quantities of tramadol, a Schedule IV controlled substance, in violation of Title 21, United States Code, Section 841(a)(1); all in violation of Title 21, United States Code, Section 846.

## Purpose of the Conspiracy

207. It was a purpose of the conspiracy for the defendant and his co-conspirator to unlawfully obtain, distribute, and deliver controlled substances, namely tramadol, without valid prescriptions.

## Manner and Means of the Conspiracy

The manner and means by which the defendant and his co-conspirator sought to accomplish the object and purpose of the conspiracy included, among other things:

208. **WALTERS** and Parker were business partners regarding Prime Care Marketing and had no nurse-patient relationship.

209. In or around January 2014, **WALTERS** represented to Parker that he (**WALTERS**) was experiencing pain due to weight-gain and requested that Parker write a prescription to **WALTERS** for tramadol. **WALTERS** further represented to Parker that tramadol improved his mood.

210. On or about January 22, 2014, at **WALTERS'** request, Parker authorized a prescription for tramadol to **WALTERS**, without first examining **WALTERS** and not for a legitimate medical purpose ("fraudulent prescription"), in exchange for **WALTERS'** agreement to deliver half of the tramadol tablets back to Parker, who did not have a valid prescription for tramadol.

211. That same day, **WALTERS** filled the fraudulent prescription and received 120 50mg tramadol tablets, and, in turn and as per the agreement, distributed and delivered approximately 60 50mg tramadol tablets to Parker, despite Parker not having a valid prescription.

212. Thereafter, on four separate occasions, namely on or about March 31, 2014, August 29, 2014, September 14, 2015, and December 22, 2015 ("other dates"), **WALTERS** caused Parker to

authorize additional fraudulent prescriptions for tramadol.

213.   On those other dates, **WALTERS** again filled the fraudulent prescriptions authorizing tramadol tablets, and, in turn and as per the agreement, distributed and delivered approximately half of the tramadol tablets obtained to Parker, despite Parker not having valid prescriptions for tramadol.

All in violation of Title 21, United States Code, Section 846.

## COUNTS 23-25

214.   Paragraphs 1 through 184 of the Superseding Indictment are re-alleged and incorporated by reference as though fully set forth herein.

215.   On or about the dates set forth below, in Lamar County, in the Southern District of Mississippi, and elsewhere, the defendant,

## WADE ASHLEY WALTERS,

aided and abetted by Parker, did knowingly and intentionally distribute quantities of tramadol, a Schedule IV controlled substance:

| Count | Date | Controlled Substance |
|-------|------|----------------------|
| 23 | 08/29/2014 | Approximately 60 tablets of tramadol (approximately 3 grams) |
| 24 | 09/14/2015 | Approximately 45 tablets of tramadol (approximately 2.25 grams) |
| 25 | 12/22/2015 | Approximately 45 tablets of tramadol (approximately 2.25 grams) |

Each of the above is a violation of Title 21, United States Code, Section 841(a)(1) and Title 18, United States Code, Section 2.

## COUNT 26

### The Conspiracy and Its Objects

216.   Paragraphs 1 through 184 of the Superseding Indictment are re-alleged and incorporated by reference as though fully set forth herein.

217.   Beginning in or around August 2012, and continuing through in or around January 2016,

in Lamar County, in the Southern District of Mississippi, and elsewhere, the defendant,

### WADE ASHLEY WALTERS,

did knowingly conspire and agree with Nichols, Parker, Thomley, May, Beach, Spell, Moran, Co-Conspirator 1, Co-conspirator 2, Co-conspirator 3, Co-conspirator 4, Co-conspirator 5, Co-conspirator 6, Co-conspirator 7, Co-conspirator 8, Co-conspirator 9, Co-conspirator 10, and others known and unknown to the Grand Jury,

       a.     To defraud the United States by impairing, impeding, obstructing, and defeating, through deceitful and dishonest means, the lawful government functions of the United States Department of Defense in its administration and oversight of TRICARE, in violation of Title 18, United States Code, Section 371, and to commit certain offenses against the United States, that is:

       b.     to knowingly and willfully solicit and receive remuneration, specifically, kickbacks and bribes, directly and indirectly, overtly and covertly, in return for referring individuals for the furnishing and arranging for the furnishing of any item and service for which payment may be made in whole or in part by a Federal health care program, that is, TRICARE; and for the purchasing, leasing, ordering, and arranging for and recommending the purchasing, leasing, and ordering of any good, item, and service for which payment may be made in whole and in part by a Federal health care program, that is, TRICARE, in violation Title 42, United States Code, Sections 1320a-7b(b)(1)(A) and 1320a-7b(b)(1)(B); and

       c.     to knowingly and willfully offer and pay remuneration, specifically, kickbacks and bribes, directly and indirectly, overtly and covertly, in return for referring individuals for the furnishing and arranging for the furnishing of any item and service for which payment may be made in whole or in part by a Federal health care program, that is, TRICARE;

and for the purchasing, leasing, ordering, and arranging for and recommending the purchasing, leasing, and ordering of any good, item, and service for which payment may be made in whole and in part by a Federal health care program, that is, TRICARE, in violation of Title 42, United States Code, Sections 1320a-7b(b)(2)(A) and 1320a-7b(b)(2)(B).

### Overt Acts

218.   In furtherance of the conspiracy, and to accomplish its objects and purpose, **WALTERS** and his co-conspirators committed and caused to be committed, in Lamar County, in the Southern District of Mississippi, and elsewhere, the following overt acts:

a.      Between September 2014 and January 2016, Sunflower Pharmacy paid remuneration, approximately seventy percent of which constituted kickbacks and bribes in exchange for referring prescriptions for high-margin compounded medications dispensed to beneficiaries, from its account held at Planters Bank, bearing account No. 0802, to Innovative Management Solutions. Those payments included, among others, the following payments being deposited into Innovative Management Solutions' Planters Bank account No. 1024:

b.      Check No. 1516, written on or about January 21, 2015, in the amount of $2,904,159.32;

c.      Check No. 1519, written on or about February 10, 2015, in the amount of $2,000,000.00;

d.      Check No. 1527, written on or about February 20, 2015, in the amount of $989,286.12;

e.      Check No. 1533, written on or about March 12, 2015, in the amount of $6,602,578.80;

f.      Check No. 1553, written on or about April 15, 2015, in the amount of $9,700,206.92;

g.      Check No. 1568, written on or about May 13, 2015, in the amount of $8,482,551.73; and

h.      Check No. 1580, written on or about June 4, 2015, in the amount of $2,461,841.93.

i.      On or about October 8, 2015, **WALTERS** held a directors' and managers' meeting in Lamar County, Mississippi, wherein **WALTERS** and Spell voted that **WALTERS** and others, including Spell and Co-conspirator 9, be granted signature authority over Planters Bank account No. 0802.

j.      On or about October 19, 2015, Sunflower Pharmacy, by way of check No. 1639, drawn on Planters Bank account No. 0802, paid to Innovative Management Solutions approximately $471,906.50, a portion of which constituted kickbacks and bribes, in exchange for referring prescriptions for high-margin compounded medications dispensed to beneficiaries.

k.      Between September 2014 and January 2016, **WALTERS**, as a co-owner of Sunflower Pharmacy, received approximately $12,565,761.07 from Sunflower Pharmacy. Specifically, **WALTERS** received into Medworx Sunflower's Regions Bank account No. 3218, which was held in Lamar County, Mississippi, the following payments from Sunflower Pharmacy's Planters Bank account No. 0802:

l.      On or about April 23, 2015, check No. 1562, in the amount of $5,000,000.00;

m.      On or about June 9, 2015, check No. 1586, in the amount of $5,000,000.00; and

n.      On or about July 31, 2015, check No. 1617, in the amount of $2,565,761.07.

o.      Between January 2015 and January 2016, CFK Pharmacy wired monies

received as reimbursements from TRICARE and other health care benefit programs, into account No. 9266, held by Medworx Pharmacy, at Wells Fargo Bank, in Lamar County, Mississippi, over which **WALTERS** had signature authority. In turn, Medworx Pharmacy paid remuneration, a portion of which constituted kickbacks and bribes, in exchange for referring prescriptions for high-margin compounded medications dispensed to beneficiaries, to Group 2, from its account held at Wells Fargo Bank, in Lamar County, Mississippi, bearing account No. 9266, including the following wire transfers:

p.      Wire transmission, on or about February 10, 2015, in the amount of $5,000,000.00;

q.      Wire transmission, on or about February 12, 2015, in the amount of $5,161,223.47;

r.      Wire transmission, on or about March 11, 2015, in the amount of $5,000,000.00;

s.      Wire transmission, on or about March 26, 2015, in the amount of $5,000,000.00;

t.      Wire transmission, on or about April 23, 2015, in the amount of $8,168,469.51;

u.      Wire transmission, on or about April 29, 2015, in the amount of $8,798,299.67;

v.      Wire transmission, on or about May 12, 2015, in the amount of $13,241,467.25; and

w.      Wire transmission, on or about May 21, 2015, in the amount of $12,793,745.71.

All in violation of Title 18, United States Code, Section 371.

## COUNTS 27-30

219. Paragraphs 1 through 184, and 218 of the Superseding Indictment are re-alleged and incorporated by reference as though fully set forth herein.

220. On or about the dates set forth below, in Lamar County, in the Southern District of Mississippi, and elsewhere, the defendant,

## WADE ASHLEY WALTERS,

aided and abetted by others known and unknown to the Grand Jury, knowingly and willfully offered, paid, solicited and received remuneration, that is kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in kind, in return for referring beneficiaries to a person for the furnishing and arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program as defined in Title 42, United States Code, Section 1320a-7b(f), that is, TRICARE, as set forth below:

| Count | Description | Approximate Date of Payment | Amount |
|-------|-------------|-----------------------------|--------|
| 27 | Wire transfer from Wells Fargo Bank account No. 9266, held by Medworx Pharmacy, to Group 2 | 04/23/2015 | $8,168,469.51 |
| 28 | Wire transfer from Wells Fargo Bank account No. 9266, held by Medworx Pharmacy, to Group 2 | 04/29/2015 | $8,798,299.67 |
| 29 | Wire transfer from Wells Fargo Bank account No. 9266, held by Medworx Pharmacy, to Group 2 | 05/12/2015 | $13,241,467.25 |
| 30 | Wire transfer from Wells Fargo Bank account No. 9266, held by Medworx Pharmacy, to Group 2 | 05/21/2015 | $12,793,745.71 |

Each of the above is a violation of Title 42, United States Code, Section 1320a-7b(b) and Title 18, United States Code, Section 2.

## COUNT 31

### The Conspiracy and Its Objects

221.    Paragraphs 1 through 184, and 218 of this Superseding Indictment are re-alleged and incorporated by reference as if fully set forth herein.

222.    From in or around December 2013, and continuing through in or around January 2016, within the Southern District of Mississippi, and elsewhere, the defendant,

### WADE ASHLEY WALTERS,

did knowingly and intentionally conspire and agree with Thomley, Beach, Co-conspirator 13, Co-conspirator 14, and other persons, known and unknown to the Grand Jury, to commit offenses against the United States, specifically to knowingly conduct and attempt to conduct a financial transaction affecting interstate and foreign commerce, specifically, issuing and depositing checks and initiating wire transfers, which involved the proceeds of a specified unlawful activity, that is health care fraud, in violation Title 18, United States Code, Section 1347, wire fraud, in violation of Title 18, United States Code, Section 1343, mail fraud, in violation of Title 18, United States Code, Section 1341, and paying and receiving health care kickbacks, in violation of Title 42, United States Code, Section 1320a-7b(b), knowing that the transaction was designed in whole and in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of said specified unlawful activity and that while conducting and attempting to conduct such financial transaction knowing that the property involved in the financial transaction represented the proceeds of some form of unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i).

56

**Purpose of the Conspiracy**

223.  It was a purpose of the conspiracy to conduct wire transfers and issue and deposit checks representing the proceeds of health care fraud, wire fraud, mail fraud, and paying and receiving health care kickbacks, to conceal said proceeds and obscure their nature, location, source, ownership, and control.

**Manner and Means**

224.  The following were among the manner and means used by **WALTERS** and his co-conspirators to accomplish the objects of the conspiracy:

225.  **WALTERS** and his co-conspirators, including Co-Conspirator 5, Co-conspirator 13, and Co-conspirator 14, directed the proceeds earned from Advantage Pharmacy, AMI Pharmacy, Medworx Pharmacy, and CFK Pharmacy, and derived from health care fraud, wire fraud, mail fraud, and paying and receiving health care kickbacks, to accounts in the name of IPMS.

226.  **WALTERS** and his co-conspirators commingled their funds in accounts in the name of IPMS with other co-conspirators of the schemes to defraud in order to obscure and conceal their ownership.

227.  **WALTERS** and his co-conspirators each held an account labeled "Series" followed by a letter corresponding to each co-conspirator to further anonymize the control of the funds.

228.  **WALTERS** and his co-conspirators directed funds through the accounts of IPMS to shell entities used to further launder the funds, purchase real property, and benefit themselves.

229.  **WALTERS** and his co-conspirators used LLCs, nominees, trusts, and other entities to obscure and conceal the fraud proceeds.

All in violation of Title 18, United States Code, Section 1956(h).

## COUNT 32

230. Paragraphs 1 through 184 of this Superseding Indictment are re-alleged and incorporated by reference as if fully set forth herein.

231. On or about August 28, 2015, in the Southern District of Mississippi, and elsewhere, the defendant,

## WADE ASHLEY WALTERS,

did knowingly conduct and attempt to conduct a financial transaction affecting interstate and foreign commerce, specifically, causing a wire transfer from Regions Bank account No. 9629 in the name of Walters Consulting to Wells Fargo account No. 6960 in the name of IPMS for $5,000,000.00, which involved the proceeds of a specified unlawful activity, that is, health care fraud, in violation Title 18, United States Code, Section 1347, wire fraud, in violation of Title 18, United States Code, Section 1343, mail fraud, in violation of Title 18, United States Code, Section 1341, and paying and receiving health care kickbacks, in violation of Title 42, United States Code, Section 1320a-7b(b), knowing that the transaction was designed in whole and in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of said specified unlawful activity and that while conducting and attempting to conduct such financial transaction knowing that the property involved in the financial transaction represented the proceeds of some form of unlawful activity.

All in violation of Title 18, United States Code, Sections 1956(a)(1)(B)(i) and 2.

## COUNT 33

232. Paragraphs 1 through 184 of this Superseding Indictment are re-alleged and incorporated by reference as if fully set forth herein.

233.   On or about December 31, 2015, in the Southern District of Mississippi, and elsewhere, the defendant,

**WADE ASHLEY WALTERS,**

did knowingly conduct and attempt to conduct a financial transaction affecting interstate and foreign commerce, specifically, causing a wire transfer from Regions Bank account No. 0052 in the name of Walters Consulting to Wells Fargo account No. 6960 in the name of IPMS for $2,000,000.00, which involved the proceeds of a specified unlawful activity, that is, health care fraud, in violation Title 18, United States Code, Section 1347, wire fraud, in violation of Title 18, United States Code, Section 1343, mail fraud, in violation of Title 18, United States Code, Section 1341, and paying and receiving health care kickbacks, in violation of Title 42, United States Code, Section 1320a-7b(b), knowing that the transaction was designed in whole and in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of said specified unlawful activity and that while conducting and attempting to conduct such financial transaction knowing that the property involved in the financial transaction represented the proceeds of some form of unlawful activity.

All in violation of Title 18, United States Code, Sections 1956(a)(1)(B)(i) and 2.

### COUNT 34

234.   Paragraphs 1 through 184 of this Superseding Indictment are re-alleged and incorporated by reference as if fully set forth herein.

235.   On or about May 7, 2015, in the Southern District of Mississippi, and elsewhere, the defendant,

**WADE ASHLEY WALTERS,**

59

did knowingly conduct and attempt to conduct a financial transaction affecting interstate and foreign commerce, specifically, make a payment by check No. 1334 drawn on Planters Bank account No. 1024 in the name of Innovative Management Solutions to Wells Fargo account No. 9191 in the name of Dippers, LLC for $2,000,000.00, which involved the proceeds of a specified unlawful activity, that is, health care fraud, in violation Title 18, United States Code, Section 1347, wire fraud, in violation of Title 18, United States Code, Section 1343, mail fraud, in violation of Title 18, United States Code, Section 1341, and paying and receiving health care kickbacks, in violation of Title 42, United States Code, Section 1320a-7b(b), knowing that the transaction was designed in whole and in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of said specified unlawful activity and that while conducting and attempting to conduct such financial transaction knowing that the property involved in the financial transaction represented the proceeds of some form of unlawful activity.

All in violation of Title 18, United States Code, Sections 1956(a)(1)(B)(i) and 2.

### COUNTS 35-37

236.    Paragraphs 1 through 184 of this Superseding Indictment are re-alleged and incorporated by reference as if fully set forth herein.

237.    On or about December 31, 2015, in the Southern District of Mississippi, and elsewhere, the defendant,

### WADE ASHLEY WALTERS,

did knowingly conduct and attempt to conduct the following financial transactions affecting interstate and foreign commerce, specifically, causing an electronic transfer from Regions Bank account No. 4385 in the name of Walters Holdings to Regions Bank account No. 9629 in the name of Walters Consulting, which involved the proceeds of a specified unlawful activity, that is, health

care fraud, in violation Title 18, United States Code, Section 1347, wire fraud, in violation of Title 18, United States Code, Section 1343, mail fraud, in violation of Title 18, United States Code, Section 1341, and paying and receiving health care kickbacks, in violation of Title 42, United States Code, Section 1320a-7b(b), knowing that the transaction was designed in whole and in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of said specified unlawful activity and that while conducting and attempting to conduct such financial transaction knowing that the property involved in the financial transaction represented the proceeds of some form of unlawful activity:

| Count | Dollar Amount of Transfer |
|-------|---------------------------|
| 35    | $245,300                  |
| 36    | $262,756                  |
| 37    | $245,301                  |

Each of the above is a violation of Title 18, United States Code, Sections 1956(a)(1)(B)(i) and 2.

## FORFEITURE ALLEGATIONS

238. Upon conviction of any of the offenses alleged in Counts 10, 11 through 18, and/or 26 through 30 of this Indictment, the defendant shall forfeit to the United States any property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offenses, pursuant to Title 18, United States Code, Section 982(a)(7), and any property, real or personal, which constitutes or is derived from proceeds traceable to these offenses, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c). The grand jury finds probable cause that, based on the evidence provided during presentment, the following property is subject to forfeiture:

| Criminal Forfeiture Identifier | Identifier from parallel Civil Case *United States v. Real Property Located at 19 Crane Park*, 2:18-cv-165 | Asset Description |
|---|---|---|
| A1 | A-009 | $1,192.91 seized from The First account number 15001878, an account in the name of P3 in a Pod, LLC |
| A2 | A-125 | $123,443.70 seized from WFB account number 5750593864, an account in the name of Co-conspirator 5. |
| A3 | N/A | $1.5 million traceable to the sale of 505 Blair Branch Road, Walland, Tennessee, held in escrow. |
| B1 | B-001 | 2015 Super Air Nautique G23-23.00' Boat with Hull ID CTC54385C515 and Vessel #FIO630PX and a 2015 Tilt Tandem Trailer with VIN 5A7BB2321FT000422, with all attachments thereon, registered to Wade Ashley Walters. |
| B2 | B-002 | 2013 Mercedes Benz G550, VIN WDCYC3HF9DX212259, Tag MS LMF592, with all attachments thereon, registered to Wade Walters Consulting, Inc. |
| B3 | B-003 | 2015 Ford F-150, VIN 1FTEW1EF3FFA26041, Tag MS LM5522, with all attachments thereon, registered to Walters Consulting, Inc. |
| B4 | B-005 | 2015 Mercedes Benz SL 400, VIN WDDJK6FA0FF035487, with all attachments thereon, registered to Wade Walters Consulting, Inc. |
| B5 | B-006 | 2015 Mercedes Benz GL 550, VIN 4JGDF7DE0FA567032, Tag MS LML552, with all attachments thereon, registered to Wade Walters Consulting, Inc. |
| B6 | B-016 | Cirrus Design Corporation Aircraft Model SR22T, fixed-wing, single-engine aircraft, with tail number N729DW and serial number 0714, registered to Performance Aviation, LLC. |
| C1 | C-002 | 104 Bocage Ct., Hattiesburg, Lamar County, MS, titled to Wade Ashley Walters and Co-conspirator 5.<br><br>Legally described as:<br><br>Real property located at 104 Bocage Court, Hattiesburg, Lamar County, Mississippi; more particularly described as:<br><br>Parcel No. 101Q-12-052.000<br><br>Lot 4, Canebrake Golf Community, Brake GD, in the County of Lamar, State of Mississippi, as per the map or |

| | | |
|---|---|---|
| | | plat thereof on file and of record in the office of the Chancery Clerk of Lamar County, Mississippi, at Plat Book 2, Page 141, Slide A-206; together with all improvements thereon and appurtenances thereunto belonging.<br><br>ALSO, Being described as Lot GD-4, Canebrake Golf Community, in the County of Lamar, State of Mississippi, as per the map or plat thereof on file and of record in the office of the Chancery Clerk of Lamar County, Mississippi, at Plat Book 2, Page 141, Slide A-206; together with all improvements thereon and appurtenances thereunto belonging. |
| C2 | C-003 | Parcel 088-18007, Tallahatchie County, MS, titled to Wade Ashley Walters. |
| | | Legally described as:<br><br>Real property located in Tallahatchie County, Mississippi, more particularly described as:<br><br>Parcel No. 088-18007<br><br>S ½ of SW ¼ of Section 18 – T24-R2E, containing 80 acres more or less being located in the First Judicial District of Tallahatchie County, Mississippi. |
| C3 | C-004 | Parcel 088-19006, Tallahatchie County, MS, titled to Wade Ashley Walters. |
| | | Legally described as:<br><br>Real property located in Tallahatchie County, Mississippi, more particularly described as:<br><br>Parcel No. 088-19006<br><br>77 acres in the South Half of the Northwest Quarter (less part off the end) of Section 19, Township 24 North, Range 2 East. |
| C4 | C-005 | Parcel 088-19007, Tallahatchie County, MS, titled to Wade Ashley Walters. |
| | | Legally described as:<br><br>Real property located in Tallahatchie County, Mississippi, more particularly described as:<br><br>Parcel No. 088-19007 |

| | | |
|---|---|---|
| | | N ½ of NW ¼ and N 10 acres of S ½ of NW ¼, all located in Section 19, Township 24, Range 2 East. 97 acres |
| C5 | C-006 | Parcel 088-19002, Tallahatchie County, MS, titled to Wade Walters Consulting Inc. |
| | | Legally described as: Real property located in Tallahatchie County, Mississippi, more particularly described as: Parcel No. 088-19002 The Southwest Quarter of the Northeast Quarter and the Northwest Quarter of the Southeast Quarter of section 19, Township 24 North, Range 2 East, First Judicial District, Tallahatchie County, Mississippi. Being 86 acres, more or less. |
| C6 | C-012 | 80 Sandy Creek Dr., Santa Rosa Beach, Walton County, Florida, titled to Wade Ashley Walters & Co-conspirator 5. |
| | | Legally described as: Real property located at 80 Sandy Creek Drive, Santa Rosa Beach, Walton County, Florida, more particularly described as: Parcel No. 15-3S-19-25419-000-0170 Lot 17, Sandy Creek at WaterColor, according to the map or plat thereof, as recorded in Plat Book 15, Page(s) 57 through 57B, inclusive, of the Public Records of Walton County, Florida. |
| C7 | C-019 | Parcel 101Q-12-053.001 (Bocage Ct.) Hattiesburg, Lamar County, MS, titled to Wade Ashley Walters, and Co-conspirator 5. |
| | | Legally described as: Real property located at Bocage Court, Hattiesburg, Lamar County, Mississippi (Corner of Lot 13 Canebrake Golf Community), more particularly described as: Parcel No. 101Q-12-053.001 A parcel of land being part of Lot 13 of Canebrake Golf Community, Brake GE, Lamar County, Mississippi, said parcel more particularly described as follows: |

| | | |
|---|---|---|
| | | Begin at the Southeast corner of Lot 12 of said Canebrake Golf Community, Brake GE Subdivision; thence run South 87 degrees 33 minutes 12 seconds West for 59.35 feet to the East lot line of said Lot 13; thence North 04 degrees 47 minutes 49 seconds West along said East line for 22.99 feet to the Northeast corner of said Lot 13; thence run South 70 degrees 26 minutes 41 seconds West along the North lot line of said Lot 13 for 60.89 feet back to the Point of Beginning. Said parcel contains 0.02 acres more or less; together with all improvements thereon and appurtenances thereunto belonging. |
| C8 | C-023 | $496,810.82, held in escrow, in lieu of Parcels 054-26002, 054-26003, 054-26004, Tallahatchie County, MS, titled to DWWW, LLC and BPCK Nichols, LLC. |
| | | Legally described as: <br><br> Real property located in Tallahatchie County, Mississippi, more particularly described as: <br><br> Parcel Nos. 054-26002, 054-26003, 054-26004 <br><br> TRACT ONE <br> Sectional lots 8, 9, 10, 11 and 12 (being the South Half situated South and West of O'Possum Bayou) of Section 26, Township 25 North, Range 1 West, Second Judicial District of Tallahatchie County, MS BUT, <br><br> SUBJECT TO a right of way, 10 feet wide, adjacent to the South right of way of a County Road, by Lula Mae Hicks in favor of Brazil-Sumner Water Association, Inc. per instrument filed for record April 7, 1980, and recorded in Book 221, at Page 254, in the Offices of the Chancery Clerk of said County. <br><br> TRACT TWO <br> 4.34 acres located in Northwest ¼ of the Southeast Section 26, Township 25 North, Range 1 West, Second Judicial District, Tallahatchie County, Mississippi. |
| C9 | C-048 | 532 Farmside Lane, Unit #14, Walland, Blount County, Tennessee, further described in Exhibit #1, titled to B.T., Trustee for Wade Ashley Walters and Co-conspirator 5's Irrevocable Trust. |
| | | Legally described as: <br><br> Those certain premises comprising a portion of the project known as BLACKBERRY FARMSIDE, A |

CONDOMINIUM, situated in the Eighteenth (18th) Civil District of Blount County, Tennessee, such project having been established as a condominium by Declaration of Condominium for Blackberry Farmside, A Condominium dated as of August 5, 2013, of record in Record Book 2367, Page 215, as amended by Amendment to Declaration of Condominium of Blackberry Farmside, A Condominium dated as of March 31, 2014, of record in Record Book 2384, page 2290, as amended by Amendment to Declaration of Condominium of Blackberry Farmside, A Condominium dated as of March 19, 2015, of record in Record Book 2411, page 2757, as amended by that Amendment to Declaration of Condominium of Blackberry Farmside, A Condominium dated as of September 17, 2015, of record in Record Book 2427, page 1922, and as amended by that Amendment to Declaration of Condominium of Blackberry Farmside, A Condominium dated as of November 20, 2015, of record in Record Book 2433, page 2695, all in the Register of Deeds Office for Blount County, Tennessee (collectively, the "Declaration of Condominium"), pursuant to the provisions of the Tennessee Condominium Act of 2008 (Tennessee Code Annotated Sections 66-27-201, et seq.),as amended, the premises being more particularly described as follows:

1.      Unit #14, located at 532 Farmside Lane, Walland, Tennessee 37886, such Unit being shown on the condominium plat that is attached as Exhibit "C" to the aforesaid Declaration of Condominium (as plat is amended by schedules to the aforesaid Amendments to Declaration of Condominium);

2.      Together with an undivided interest in the Common Elements of the project as described in the Declaration of Condominium.

TOGETHER WITH AND SUBJECT TO THE RIGHTS OF OTHERS in the non-exclusive easements for ingress and egress described in the Declaration of Joint Permanent Easements dated May 12,2004, of record in Record Book 2017, page 1715, in the Blount County Register of Deeds Office, as amended by Amendment of Declaration of Joint Permanent Easement dated June 11, 2010, of record in Record Book 2265, Page 2858, in the Blount County Register of Deeds Office; and with the corresponding right of use of Joe Pye Lane as shown on the plats of record in

| | | |
|---|---|---|
| | | Map File 303IB and Map File 2790B in tl1e Blount County Register of Deeds Office. Also see Amendment to Declaration of Covenants and Restrictions for Singing Brook at Blackberry Farm dated July I, 2013, of record in Record Book 3267, page 191 in the Blount County Register of Deeds Office, relating to said non-exclusive access rights. |
| | | ALSO TOGETHER WITH AND SUBJECT TO THE RIGHTS OF OTHERS in the nonexclusive easements for ingress and egress, for utilities and for other matters described in that Easement Declaration dated November 20, 2015, of record in Record Book 2433, Page 2748, in the Blount County Register of Deeds Office. |
| | | BEING part of the same property conveyed Blackberry Development Company by Warranty Deed dated November 20, 2015, of record in Record Book 2433 ,Page 2691, in the Register of Deeds Office for Blount County, Tennessee, Being the same property conveyed to Brad Trussell, Trustee for The Wade And Dorothy Walters Irrevocable Trust dated October 12, 2015 from Blackberry Development Company by Unit Deed dated November 23, 2015, of record in Record Book 2433, page 2762, in the Blount Register of Deeds Office. |
| C10 | C-049 | Parcel 082-063.06 (17.65 Acres) on Wolf Creek Road, Walland, Blount County, Tennessee, titled to B.T., Trustee for Wade Ashley Walters and Co-conspirator 5's Irrevocable Trust. |
| | | Legally described as: |
| | | SITUATED In District No. Eighteen (18) of Blount County, Tennessee, and being more particularly described as follows: |
| | | TRACT I: |
| | | BEGINNING at an iron pin found in the edge of Hearon Road, being 1200 ft., more or less, to Millers Cove Road; thence with the line of N. Hearon N. 24-25 W. 365.37 ft., to an Iron rod set at a fence line; thence N. 89-02 E. 73.32 ft. to a point; thence s. 24-26 E. 394.05 ft. to a point in the edge of Hearon Road; thence with the edge of Hearon Road N. 20-34 E. 28.28 ft. to the point of BEGINNING, and being a strip of land to be used for a right of way for |

| | | |
|---|---|---|
| | | Ingress and egress to Tract II described herein and containing 0.17 acres, more or less.<br><br>TRACT II:<br><br>BEGINNING at an Iron rod set at a fence line, said Iron rod being located N. 24-26 W.<br>365.37 ft. from an Iron pin found in the edge of Hearon Road; thence from said Iron rod set a fence line with the line of N. Hearon N. 24-17 W. 1,078.20 ft. to a found stone on ridge, comer to Braun; thence with the line of A. Braun S. 54-38 W. 740.84 ft. to an Iron rod; thence with the line of A. Braun S. 05-36 E. 372.90 ft. to a found stone on the west bank of the stream; thence continuing with the line of A. Braun s.05-26 E. 471.07 ft. to an Iron rod set at a 34 inch poplar at an old fence line, corner to the remaining lands of M. E. Keener North 66-09 East 663.06 ft. to an Iron rod; thence continuing with the remaining lands of M. E. Keener North 74-33 East 166.25ft. to an Iron rod; thence continuing with the lands of M. E. Keener South 77-51 East 130.38 ft. to an iron rod; thence continuing with the remaining lands of M. E. Keener North 89-02 East 73.32 ft. to the iron rod at the point of BEGINNING at a fence line, and containing 17.48 acres, more or less, as per survey of Richard H. Everett, dated September 24, 1981, Registered<br>Land surveyor, Tennessee No. 862.<br><br>BEING the same property conveyed to Robert Gordon Thompson, II by Quit Claim Deed from Nancy Carolyn McLemore Thompson, dated 04/03/1993, recorded 04/05/1993, in Book 548, Page 330, In the Registers Office for Blount County, Tennessee.<br><br>Commonly known as: Wolf Creek Road, Walland, TN 37886<br><br>Designated as Tax ID: 082-063.06 |
| C11 | C-050 | 19 Crane Park, Hattiesburg, Lamar County, MS, titled to Wade Ashley Walters and Co-conspirator 5. |
| | | Legally described as:<br><br>Real property located at 19 Crane Park, Hattiesburg, Lamar County, Mississippi, more particularly described as:<br><br>Parcel No. 101G-01-055.000 |

Lot 20 of Canebrake, Brake "TT-1", First Revision, a Subdivision of the County of Lamar, State of Mississippi, as per the map or plat thereof on file and of record in the office of the Chancery Clerk of Lamar County, Mississippi, at Plat Book 2, Page 95, Slide A-160 together with all improvements thereon and appurtenances thereunto belonging.

Subject to prior reservations of oil, gas and other minerals by former owners.

Taxes for the year 2004 shall be pro-rated as of the date of this instrument and assumed by the Grantee. It is specifically agreed and understood that taxes for the current year are pro-rated based upon the previous years taxes.

Subject to those certain Subdivision Regulations adopted by the Board of Supervisors of Lamar County of record in Minute Book 59 at Page 202 and amended in Minute Book 82 at Page 282 and amended in Minute Book 112 at Page 144 and amended further in Minute Book 112 at Page 290 in the office of the Chancery Clerk of Lamar County, Mississippi.

Subject to that certain Declaration of Covenants, Conditions and Restrictions for Canebrake Subdivision from Bennett V. York to The Public, dated December 17, 1985 and of record in Book 7-T at Page 380 in the office of the Chancery Clerk of Lamar County, Mississippi; said Covenants have been amended and of record in Book 9-I at Page 141 in the office of the Chancery Clerk of Lamar County, Mississippi; said Covenants have been supplemented and of record in Book 8-C at Page 108 in the office of the Chancery Clerk of Lamar County, Mississippi; said Covenants have been supplemented and recorded in Book 11-G at Page 16 in the office of the Chancery Clerk of Lamar County, Mississippi.

Subject to that certain Corrected Waiver and Release of First Right of Refusal to Bennett V. York, dated May 11, 1992 and of record in Book 10-C at Page 528 in the office of the Chancery Clerk of Lamar County, Mississippi.

| | | |
|---|---|---|
| | | Subject to that certain Shared Use Agreement from Canebrake Owners Association, Inc. to Canebrake Golf Community Association, Inc., dated October 4, 1996 and recorded in Book 12-M at Page 667 and I.D. Book 1 at Page 217 and amended in Book 12-Q at Page 365 and I.D. Book 1 at Page 233, second amendment dated December 20, 1999 recorded in Book 14-G at Page 678 and I.D. Book 1 at Page 275, and dated January 15, 1997 recorded in Book 14-G at Page 662 and I.D. Book 1 at Page 259 in the office of the Chancery Clerk of Lamar County, Mississippi.<br><br>Subject to that certain Easement from Bennett V. York to Pearl River Valley Electric Power Association, dated October 14, 1985 and filed for record in Book 7-S at Page 394 in the office of the Chancery Clerk of Lamar County, Mississippi.<br><br>Subject to that certain Easement from Bennett V. York to Pearl River Valley Electric Power Association, dated October 11, 1993 and filed for record in Book 10-V at Page 432 in the office of the Chancery Clerk of Lamar County, Mississippi.<br><br>Subject to that certain Easement from Bennett V. York to Pearl River Valley Electric Power Association, dated August 9, 1994 and filed for record in Book 11-G at Page 175 in the office of the Chancery Clerk of Lamar County, Mississippi. |
| C12 | N/A | 112 Oxford Creek Drive, Oxford, Lafayette County, MS titled to Co-conspirator 12. |
| | | Legally described as:<br><br>Real property located at 112 Oxford Creek Drive, Oxford, Lafayette County, Mississippi, more particularly described as:<br><br>Parcel No. 135F-16-043.27<br><br><br>TOWNSHIP 8 SOUTH, RANGE 3 WEST, SECTION 16:<br><br>Lot No. 7 of Oxford Creek Subdivision, as set out and shown on the official map and plat of said subdivision found among the land records of Lafayette County, Mississippi, in Plat Cabinet B on Slide 128, as of February |

| | | 25th, 2005, at 2:25 p.m., as amended, reference of which is hereby made in aid of description hereof. |

239.   Upon conviction of the any of the offenses alleged in Counts 10, 11 through 18, and/or 26 through 37 of this Indictment, the defendants shall forfeit to the United States any property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offenses, pursuant to Title 18, United States Code, Section 982(a)(7), any property, real or personal, which constitutes or is derived from proceeds traceable to these offenses, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), and any property, real or personal, involved in these offenses, or any property traceable to such property, pursuant to Title 18, United States Code, Section 982(a)(1). The grand jury finds probable cause that, based on the evidence provided during presentment, the following property is subject to forfeiture:

| Criminal Forfeiture Identifier | Identifier from parallel Civil Case *United States v. Real Property Located at 19 Crane Park*, 2:18-cv-165 | Asset Description |
|---|---|---|
| A4 | A-002 | $138,775.22 seized from The First account number 15002454, an account in the name IPMSI Holdings, LLC, Series C. |
| A5 | A-004 | $448,586.98 seized from Regions account number 19560052, an account in the name of Wade Walters Consulting, Inc. |
| A6 | A-005 | $330,496.54 seized from Regions account number 150249398, an account in the name of Wade Walters Consulting, Inc. |
| A7 | A-008 | $1,905,238.23 seized from Regions account number 19528418, an account in the name of Wade Ashley Walters & Co-conspirator 5. |
| A8 | A-011 | $529,197.81 seized from Regions account number 49648314, an account in the name of Performance Accounts Receivable, LLC. |

| A9 | A-012 | $227,230.38 seized from Regions account number 92435203, an account in the name of Prime Care Revenue Management, LLC. |
|---|---|---|
| A10 | A-013 | $82,300.22 seized from Regions account number 133606447, an account in the name of Prime Care Management Group. |
| A11 | A-014 | $153,179.87 seized from Regions account number 51174243, an account in the name of Performance Capital Leasing, LLC. |
| A12 | A-025 | $4,794,772.12 seized from Regions account number 150249401, an account in the name of DWWW, LLC. |
| A13 | A-033 | $490,088.62 seized from NY Life IA, account number N-29-035270, an account in the name of IPMSI Holdings LLC, Series C. |
| A14 | A-037 | $4.27 seized from NY Life IA L36-001519-1, an account in the name of IPMSI Holdings, LLC, Series C. |
| A15 | A-038 | $1.64 seized from NY Life IA L36-001505, an account in the name of DWWW, LLC. |
| A16 | A-041 | $3.74 seized from NY Life IA L36-004902, an account in the name of AF QP, LLC. |
| A17 | A-042 | $3.74 seized from NY Life IA L36-004886, an account in the name of HH QP, LLC. |
| A18 | A-043 | $2.65 seized from NY Life IA L36-004903, an account in the name of TW QP, LLC. |
| A19 | A-052 | $1,032,087.95 seized from Regions account number 150249266, an account in the name of Performance Aviation, LLC. |
| A20 | A-055 | $351,813.23 seized from Magnolia account number 8601072, an account in the name of Walters Holdings, LLC. |
| A21 | A-069 | $86,947.21 seized from NY Life IA L36-001520, an account in the name of IPMSI Holdings, LLC, Series C. |
| A22 | A-070 | $252,494.53 seized from NY Life IA L36-001522, an account in the name of IPMSI Holdings, LLC, Series C. |
| A23 | A-071 | $253,583.04 seized from NY Life IA L36-001523, an account in the name of IPMSI Holdings, LLC, Series C. |
| A24 | A-072 | $101,163.26 seized from NY Life IA L36-001524, an account in the name of IPMSI Holdings, LLC, Series C. |
| A25 | A-073 | $121,303.16 seized from NY Life IA L36-001525, an account in the name of IPMSI Holdings, LLC, Series C. |
| A26 | A-074 | $452,428.97 seized from NY Life IA L36-001507, an account in the name of DWWW, LLC. |
| A27 | A-075 | $462,486.98 seized from NY Life IA L36-001508, an account in the name of DWWW, LLC. |
| A28 | A-076 | $364,053.84 seized from NY Life IA L36-001509, an account in the name of DWWW, LLC. |

| A29 | A-077 | $230,845.15 seized from NY Life IA L36-001510, an account in the name of DWWW, LLC. |
| A30 | A-078 | $310,871.22 seized from NY Life IA L36-001511, an account in the name of DWWW, LLC. |
| A31 | A-087 | $5,404,498.13 seized from NY Life IA L36-004625, an account in the name of WW QP Holdings, LLC. |
| A32 | A-088 | $98,508.21 seized from NY Life IA L36-004909, an account in the name of AF QP, LLC. |
| A33 | A-089 | $260,787.87 seized from NY Life IA L36-004911, an account in the name of AF QP, LLC. |
| A34 | A-090 | $264,477.75 seized from NY Life IA L36-004908, an account in the name of AF QP, LLC. |
| A35 | A-091 | $335,549.69 seized from NY Life IA L36-004906, an account in the name of AF QP, LLC. |
| A36 | A-099 | $98,528.45 seized from NY Life IA L36-004884, an account in the name of HH QP, LLC. |
| A37 | A-100 | $260,783.37 seized from NY Life IA L36-004885, an account in the name of HH QP, LLC. |
| A38 | A-101 | $264,445.11 seized from NY Life IA L36-004883, an account in the name of HH QP, LLC. |
| A39 | A-102 | $335,341.33 seized from NY Life IA L36-004882, an account in the name of HH QP, LLC. |
| A40 | A-103 | $97,330.21 seized from NY Life IA L36-004912, an account in the name of TW QP, LLC. |
| A41 | A-104 | $124,422.79 seized from NY Life IA L36-004910, an account in the name of TW QP, LLC. |
| A42 | A-105 | $160,851.73 seized from NY Life IA L36-004913, an account in the name of TW QP, LLC. |
| A43 | A-106 | $250,094.30 seized from NY Life IA L36-004907, an account in the name of TW QP, LLC. |
| A44 | A-114 | $980,011.25 seized from NY Life IA L36-004616, an account in the name of DW QP Holdings, LLC. |
| A45 | A-127 | $318,629.67 seized from NY Life IA L36-004617, an account in the name of DW QP Holdings, LLC. |
| A46 | A-128 | $2,019,937.34 seized from NY Life IA L36-004620, an account in the name of DW QP Holdings, LLC. |
| A47 | A-129 | $1,002,839.27 seized from NY Life IA L36-004622, an account in the name of DW QP Holdings, LLC. |
| A48 | A-130 | $318,511.03 seized from NY Life IA L36-004626, an account in the name of DW QP Holdings, LLC. |
| A49 | A-131 | $742,348.48 seized from NY Life IA L36-004627, an account in the name of DW QP Holdings, LLC. |
| A50 | A-149 | $1,233,232.13 seized from Regions account number 185909629, an account held in the name of Wade Walters Consulting, Inc. |

| C13 | C-007 | Parcel 098-3401201 Tallahatchie County, MS, titled to Walters Holdings LLC. |
|---|---|---|

Legally described as:

Real property located in Tallahatchie County, Mississippi, more particularly described as:

Parcel No. 098-3401201

Part of the SE ¼ of the SE ¼, part of the SW ¼ of the SE ¼, part of the NE ¼ of the SE ¼, and part of the NW ¼ of the SE ¼, all in Section 34, Township 24 North, Range 2 East, First Judicial District, Tallahatchie County, Mississippi, more particularly described as follows:

Beginning at a found iron pipe at the southeast corner of said Section 34; proceed thence S 89 degrees 56'53" W 1568.49 feet to a set iron pin at a fence corner on the west side of a creek or ditch; thence along said fence on the west side of said ditch as follows, N 03 degrees 00'00" E 548.98 feet, N 05 degrees 07'02" E 566.27 feet, N 05 degrees 39'18" E 669.71 feet, N 05 degrees 39'25" E 533.81 feet, N 01 degrees 33'51" E 325.05 feet to a set iron pin on the north line of the SE ¼ of said Section 34; thence East 795.28 feet to a set iron pin in the center of the old Poplar Springs Road; thence along the center of said old road to set iron pins as follows, S 16 degrees 19'16" E 150.38 feet, S 15 degrees 41'24" E 228.74 feet, S 35 degrees 23'13" E 167.55 feet, S 54 degrees 03'21" E 49.64 feet, S 34 degrees 16'20" E 97.17 feet, S 32 degrees 21'54" E 242.29 feet, S 59 degrees 20'11" E 126.71 feet, N 87 degrees 10'06" E 31.78 feet to a set iron pin on the east line of said Section 34; thence away from said old road South 1755.12 feet to the Point of Beginning, containing 81.18 acres, more or less.

EASEMENT DESCRIPTION
Part of the NW ¼ of the SE ¼ of Section 34, Township 24 North, Range 2 East, First Judicial District, Tallahatchie County, Mississippi, more particularly described as follows:

A 60 feet right of way, with 30 feet lying either side of a centerline described as beginning at a point in the center of a field road, said point being on the east right of way of Mississippi Highway 35, also being 1813.5 feet west and

| | | |
|---|---|---|
| | | 2589.9 feet north of a found iron pipe at the southeast corner of said Section 34; proceed thence along said center line as follows, S 78 degrees 26'44" E 46.77 feet, N 88 degrees 59'44" E 74.11 feet, N 88 degrees 55'11" E 68.91 feet, N 85 degrees 20'08" E 63.91 feet, N 80 degrees 18'58" E 54.07 feet, N 84 degrees 57'36" E 44.37 feet, S 82 degrees 24'33" E 39.35 feet, S 57 degrees 13'31" E 71.94 feet to the end of said easement. |
| C14 | C-008 | 6131 Yeats Manor Dr., Tampa, Hillsborough County, FL, titled to D.H. and Co-conspirator 11. |
| | | Legally described as:<br><br>Real property located at 6131 Yeats Manor Drive, Tampa, Hillsborough County, Florida<br><br>Folio No. 132427-3402<br><br>Lot 1, Block 34, Westshore Yacht Club Phase 3B, according to the Plat thereof, recorded in Plat Book 113, Page(s) 107 through 111, of the Public Records of Hillsborough County, Florida<br><br>Parcel ID Number: A0830189BS000034000010 |
| C15 | C-020 | Parcels 103-06-001.002, 103-07-006.000, 103-07-006.001, 151-01-026.000, 151-01-027.000, 151-02-010.000, 151-12-001.000, located at North Black Creek Road, Sumrall, Lamar County, MS, titled to Walters Holdings LLC. |
| | | Legally described as:<br><br>Real property located on North Black Creek Road, Lamar County, Mississippi, more particularly described as:<br><br>Parcel Nos. 103-07-006.000, 151-12-001.000, 151-01-027.000, 151-01-026.000, 151-02-010.000, 103-06-001.002,<br>103-07-006.001<br><br>Beginning at an iron pipe at the NW corner of the SW ¼ of Section 6, T-4-N, R-15-W, Lamar County, Mississippi and run N 89°39'04"E 2576.27 feet along the forty line to an iron pin at the center of said Section 6; thence run N00°14'32"W 274.80 feet along the half section line to an iron pipe on the Southerly right-of-way line of North Black Creek Road; thence run on and along a curve that curves to the right and has a radius of 492.43 feet, a central angle of |

18°46'38" for 161.38 feet, a long chord of S23°55'37"E 160.66 feet along said right-of-way line to an iron pin; thence run S17°33'31"E 168.67 feet along said right-of-way line to an iron pin; thence run S89°55'50"W 114.38 feet to an iron pin on the half section line; thence run S00°52'40"E 2622.25 feet along the half section line to a lightered post at the SE corner of the SW ¼ of said Section 6; thence run S89°49'46"W 1301.65 feet along the section line to a concrete post at the forty corner; thence run S00°01'17"E 1315.86 feet along the forty line to a concrete post at the forty corner; thence run N89°53'05"E 1300.74 feet along the forty line to an iron pin at the forty corner; thence run S00°01'06"W 1317.11 feet along the half section line to a pine knot at the forty corner; thence run S00°10'01"W 1324.34 feet along the half section line to a lightered post at the forty corner; thence run S00°22'02"E 1318.42 feet along the half section line to a pine knot at the SE corner of the SW ¼ of Section 7, T-4-N, R-15-W; thence run S89°38'31"W 2613.81 feet along section line to the SW corner of Section 7, T-4-N, R-15-W; thence run N00°04'32"W 1321.05 feet along the section line to the forty corner; thence run S89°06'57"W 1311.81 feet along the forty line to the forty corner; thence run N00°08'50"W 1321.65 feet along the forty line to the forty corner; thence run S89°08'35"W 2626.92 feet along the forty line to the forty corner; thence run N00°17'26"W 1322.85 feet along the forty line to the forty corner; thence run S89°10'12"W 1315.10 feet along the forty line to the forty corner on the section line; thence run N00°21'44"W 1323.45 feet along the section line to the NW corner of Section 12, T-4-N, R-16-W; thence run S89°43'57"W 1319.81 feet along the section line to the forty corner; thence run N00°18'14"W 1334.43 feet along the forty line to an iron pipe at the forty corner; thence run S89°43'57"W 215.51 feet along the forty line to the Easterly right-of-way line of Oloh Road; thence run N34°52'13"E 2325.27 feet along said right-of-way line to an iron pin; thence run on and along a curve that curves to the left and has a radius of 2250.90 feet, a central angle of 04°51'10" for 190.64 feet, a long chord of N32°56'30"E 190.59 feet along said right-of-way line to an iron pin on the centerline of a gravel road; thence run along said centerline of gravel road the following (31) Thirty-One calls: S53°11'38"E 185.34 feet to a cotton picken spindle, S46°48'45"E 88.14 feet to a cotton picken spindle; S33°02'47"E 200.74 feet to a cotton picken spindle; S60°51'46"E 51.71 feet to a cotton picken spindle;

| | | |
|---|---|---|
| | | S86°50'28"E 40.40 feet to a cotton picken spindle; M80°53'02"E 135.73 feet to a cotton picken spindle; N87°31'14"E 163.36 feet to a cotton picken spindle; S87°27'14"E 57.64 feet to an iron pin; S87°11'27"E 205.26 feet to an iron pin; N84°10'43"E 57.58 feet to an iron pin; N68°16'49"E 41.67 feet to an iron pin; N62°03'06"E 136.89 feet to a cotton picken spindle; N64°48'03"E 99.22 feet to a cotton picken spindle; N53°23'13"E 109.43 feet to a cotton picken spindle; N63°50'29"E 76.68 feet to a cotton picken spindle; N80°23'52"E 63.06 feet to a cotton picken spindle; S81°15'24"E 70.79 feet to a cotton picken spindle; S58°41'28"E 108.61 feet to a cotton picken spindle. S55°44'29"E 161.71 feet to a cotton picken spindle: S67°27'57"E 111.23 feet to a cotton picken spindle; S59°53'00"E 83.98 feet to a cotton picken spindle: S78°11'53"E 28.19 feet to a cotton picken spindle: N82°53'31"E 34.49 feet to a cotton picken spindle; N71°34'54"E 95.94 feet to a cotton picken spindle; N73°46'06"E 191.12 feet to a cotton picken spindle; N62°49'20"E 90.28 feet to an iron pin; S83°25'16"E 53.80 feet to a cotton picken spindle; S52°49'28"E 59.88 feet to a cotton picken spindle; S62°09'05"E 52.02 feet to a cotton picken spindle; S68°30'52"E 46.22 feet to a cotton picken spindle; S67°10'34"E 34.06 feet to a cotton picken spindle; thence run N79°38'35"E 125.31 feet to an iron pin; thence run N00°08'09"E 330.12 feet to an iron pin; thence run N00°08'09"E 627.27 feet to an iron pin; thence run N89°55'16"E 1975.89 feet along the forty line to an iron pin; thence run S00°30'42"E 1307.82 feet along to an iron pin on the forty line; thence run S89°49'58"E 650.56 feet along the forty line back to the Point of Beginning.  Said parcel contains 1243.38 acres, more or less, and being located in Sections 6 and 7, T-4-N, R-15-W and also Section 1, 2, and 12, T-4-N, R-16-W, Lamar County, Mississippi. |
| C16 | C-021 | Parcel 103-07-010.000 located at North Black Creek Road, Sumrall, Lamar County, MS, titled to Walters Holdings LLC. |
| | | Legally described as: |
| | | Real property located on North Black Creek Road, Lamar County, Mississippi, more particularly described as: |
| | | Parcel No. 103-07-010.000 |

| | | |
|---|---|---|
| | | Commence at a point in the centerline of a certain public road which point is 1149.2 feet West of the SE corner of NE ¼ of SE ¼ of Section 7, Township 4 North, Range 15 West; and run in a Northerly direction and along the centerline of said public road a distance of 613.8 feet; thence run West 647.3 feet, thence North 66 feet, thence West 687.5 feet to the West boundary line of NW ¼ of SE 1/4 , thence South along said West boundary line of said forty 663.3 feet to the SW corner of said NW ¼ of SE ¼; thence run East a distance of 1477.8 feet, more or less, back to the Point of Beginning, containing 21 acres more or less, and being situated in the NW ¼ of SE ¼ and the NE ¼ of SE ¼ of Section 7, Township 4 North, Range 15 West, Lamar County, Mississippi; together with all improvements thereon and appurtenances thereunto belonging. |
| C17 | C-022 | Parcel 103-06-003.002 located at 625 North Black Creek Road, Sumrall, Lamar County, MS, titled to Walters Holdings LLC. |
| | | Legally described as:<br><br>Real property located at 625 N. Black Creek Road, Lamar County, Mississippi, more particularly described as:<br><br>Parcel No. 103-06-003.002<br><br>A parcel of land located in the NW ¼ of the SE ¼ of Section 6, Township 4 North, Range 15 West, Lamar County, Mississippi and being more particularly described as follows:<br><br>Commence at the NW corner of the SE ¼ of Section 6, Township 4 North, Range 15 West, Lamar County, Mississippi; thence run South 00 degrees 44 minutes 38 Seconds East along the East line of said SE ¼ for 33.67 feet to and for the POINT OF BEGINNING: thence continue South 00 degrees 44 minutes 38 Seconds East along the East line of said SE ¼ for 228.59 feet; thence run North 89 degrees 51 minutes 30 seconds East for 260.05 feet to the Centerline of North Black Creek Road; thence run 235.03 feet along said Centerline and along a curve to the right, said curve having a radius of 529.26 feet, an included angle of 25 degrees 26 minutes 37 seconds, a chord bearing of North 28 degrees 42 minutes 22 seconds West and a chord length of 233.10 feet; thence run North 17 degrees 18 minutes 19 seconds West along said |

| | | |
|---|---|---|
| | | Centerline for 24.96 feet; thence run South 89 degrees 51 minutes 30 seconds West for 143.63 feet back to the POINT OF BEGINNING. Said parcel contains 1.00 acres, more or less and is subject to North Black Creek Road Right-of-Way. |
| C18 | C-051 | Parcel 088-19003, Tallahatchie County, MS titled to TWQP, LLC. |
| | | Legally described as:<br><br>Real property located in Tallahatchie County, Mississippi, more particularly described as:<br><br>Parcel No. 088-19003<br><br>The East Half of the Southeast Quarter and the Southwest Quarter of the Southeast Quarter of Section 19, Township 24 North, Range 2 East, First Judicial District, Tallahatchie County, Mississippi, being 130 acres, more or less, together with irrigation well located thereon.<br>SUBJECT TO<br>an easement to Tallahatchie County, Mississippi, for cleaning of ditch dated October 16, 1998, and recorded in Book 421 at Page 437. |
| C19 | N/A | 175 Poplar Springs Road, Cascilla, Tallahatchie County, MS, titled to Wade Walters and Co-conspirator 5's Irrevocable Trust. |
| | | Legally described as:<br><br>Real property located in Tallahatchie County, Mississippi, more particularly described as:<br><br>TRACT I:<br>All that part of W ½ of NE ¼ of Section 2, Township 23, Range 2 East lying North and East of the old Cascilla-Paynes Public Road, via of the Denman Hill, in Beat #3 of said County and being the land purchased by the (previous) Grantors herein from A.A. Murphree by deed recorded in Book 180 page 66 of the Deed Records of said County;<br><br>TRACT II:<br>Northeast Quarter of Northeast Quarter (NE ¼ of NE ¼) of Section 2, Township 23, Range 2 East and<br>Southeast Quarter of Southeast Quarter (SE ¼ of SE ¼) of Section 35; Southwest Quarter of Southwest Quarter (SW ¼ of SW ¼) of Section 36, in Township 24, Range 2 East; |

TRACT III

All that part of the SW ¼ of the NW ¼ lying North of the Cascilla and Denman Public Road, and all of that part of the NW ¼ of the SW ¼ that lies North of the Cascilla and Denman Hill Public Road, containing 1 acre, more or less; all in Section 1, Township 23 North, Range 2 East.

TRACT IV

Northwest Quarter of Northwest Quarter (NW ¼ of NW ¼) of Section1, Township 23 North, Range 2 East.
It is the intention of the grantor to covey the property designated by the following tax assessor parcel numbers: 12001013: 12001014: 12001015: 12002001: 09735003: 09736005
LESS AND EXCEPT:
Exception 1:
Beginning at the Southwest corner of the Southwest Quarter of the Northwest Quarter of Section 1, Township 23 North, Range 2 East, run thence 3.5 chains to the North right of way of the "Cascilla-Denman Hill" Road, thence run Northeasterly along said road r/o/w 2.5 chains to a point, this being the point of beginning of the parcel to be conveyed; thence run North 6.0 chains to a point; thence run East 8.4 chains; run thence South 2.0 chains, more or less, to aforesaid road r/o/w; thence run Southwesterly along said road r/o/w 9.0 chains, more or less, to the point of the beginning, and being a Lot in the SW ¼ of the NW ¼ of Section 1, Township 23 North, Range 2 East:
Reference: Warranty Deed dated January 14, 1972, recorded in Book 272 page 445

Exception 2:
Begin at the Southwest corner of the Northwest quarter of Section 1, Township 23 North, Range 2 East, First Judicial District, Tallahatchie County, Mississippi, thence East 200 feet; thence South 42 feet to the road; thence Southwest along road 272 feet; thence North 100 feet to the point of beginning, containing 1 acre, more or less, in the Southwest Quarter of Section 1 Township 23 North, Range 2 East, First Judicial District, Tallahatchie County, Mississippi
Reference: Warranty Deed dated November 30, 2005, recorded in Book 483 page 229

TRACT V:

| | | |
|---|---|---|
| | | All that part of the Northeast Quarter of the Southeast Quarter of Section 34, Township 24, Range 2 East, that lies North and East of Poplar Springs gravel road, being Five (5) acres, more or less. Being in the First Judicial District, Tallahatchie County, Mississippi.<br><br>TRACT VI:<br>The West Half (W ½): and the Northeast Quarter (NE ¼) ; and the West Half of the Southeast Quarter of Section 35, Township 24 North, Range 2 East, First Judicial District, Tallahatchie County, Mississippi.<br>Less and Except a water storage easement to Ascalmore Drg. District recorded in Book 215, page 94, land deed records, First Judicial District, Tallahatchie County, Mississippi.<br>Also less and except the Poplar Springs Cemetery.<br><br>TRACT VII<br>The Northeast Quarter of the Southeast Quarter, Section 35, Township 24, North Range 2 East, First Judicial District, Tallahatchie County, Mississippi. |
| C20 | N/A | Two parcels titled to IPMSI Holdings, LLC Series C in Tallahatchie County, MS. |
| | | Legally described as:<br><br>Real property located in Tallahatchie County, Mississippi, more particularly described as:<br><br>The Northwest Quarter of the Northwest Quarter of Section 2 and the Northeast Quarter of the Northeast Quarter and that part of the Northwest Quarter of the Northeast Quarter lying East of the Swan Lake Lambert Cut-Off or branch of the Yazoo and Mississippi Valley Railroad, of Section 3; all being in Township 24 North, Range 1 West.<br>LESS AND EXCEPT: The Northernmost 4.2676 acres of the above description. |

240.   The United States will also seek a forfeiture money judgment against the defendant in the amount of any property, real or personal, which represents or is traceable to the gross receipts obtained, directly or indirectly, from the commission of Counts 1 through 9, pursuant to Title 18, United States Code, Section 982(a)(4).

241. The United States will also seek a forfeiture money judgment against the defendant in the amount of any property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of Counts 11 through 18 and 26 through 30, pursuant to Title 18, United States Code, Section 982(a)(7).

242. The United States will also seek a forfeiture money judgment against the defendant in the amount equal to the value of any property, real or personal, which constitutes or is derived from proceeds traceable to Count Ten, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c).

243. The United States will also seek a forfeiture money judgment against the defendant in the amount equal to the value of any property, real or personal, involved in Counts 31 through 37, or any property traceable to such property, pursuant to Title 18, United States Code, Section 982(a)(1).

244. Upon conviction of any of the offenses alleged in Counts Nineteen through Twenty-Five, the defendants shall forfeit to the United States, pursuant to Title 21, United States Code, Section 853(a), any property constituting, or derived from, any proceeds obtained, directly or indirectly, as the result of these offenses; and any property used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of these offenses. The United States will seek a forfeiture money judgment against the defendant equal to the value of any property constituting, or derived from, any proceeds obtained, directly or indirectly, as the result of this offense.

245. If any of the property described above as being subject to forfeiture, as a result of any act or omission of the defendant:

      a. cannot be located upon the exercise of due diligence;

b. has been transferred or sold to, or deposited with, a third party;

c. has been placed beyond the jurisdiction of the Court;

d. has been substantially diminished in value; or

e. has been commingled with other property that cannot be subdivided without difficulty;

the defendant shall forfeit to the United States any other property, up to the value of the property described above, pursuant to Title 21, United States Code, Section 853(p).

Criminal Forfeiture, in violation of Title 18, United States Code, Sections 981(a)(1)(C), 982(a)(1), 982(a)(4), and 982(a)(7), and Title 21, United States Code, Section 853(a) and 853(p), and Title 28, United States Code, Section 2461(c).

D. MICHAEL HURST, JR.
United States Attorney

A TRUE BILL:

s/ signature redacted
Foreperson of the Grand Jury

This indictment was returned in open court by the foreperson or the deputy foreperson of the Grand Jury on this the 24th day of September, 2019.

UNITED STATES MAGISTRATE JUDGE